**Tony Christopher THOMAS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 97–CF–787.**

District of Columbia Court of Appeals.

Argued Feb. 23, 1999.

Decided July 1, 1999.

---

Sandra K. Levick, Public Defender Service, with whom James W. Klein, and Samia Fam, Public Defender Service, were on the brief, for appellant.

Alex J. Bourelly, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Stefanie F. Roemar, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN, and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

On or about February 28, 1997, Tony Christopher Thomas entered a conditional plea of guilty to the offense of second-degree murder while armed. Under the plea agreement, Thomas reserved the right, pursuant to Super. Ct.Crim. R. 11(a)(2), to appeal from the motions judge's denial of his pretrial motion to suppress statements.

On appeal, Thomas contends that, while he was in custody, the police contravened the strictures of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),

 1. by interrogating him regarding his true name without first advising him of his *Miranda* rights; and

 2. by continuing to interrogate him, following advice of rights, after he had refused to answer questions without an attorney present.

We reverse in part, affirm in part, and remand for further proceedings.

## I.

### THE FACTS [1]

On or about September 15, 1995, Thomas and his friend, James Lee Bowser, observed Gerald Harris on the street wearing jeans and boots allegedly belonging to Thomas. Thomas later discovered that the screen door to his apartment had been cut out and that some of his property was missing. Thomas confronted Harris, who appeared not to take Thomas' complaint seriously. Enraged, Thomas obtained a handgun from one of his friends, approached Harris, and shot him. Harris fell to the ground, shouting "Tony, why me? What did I do?" Thomas fired five additional shots into his prostrate victim. Harris died of his wounds. The murder was committed in broad daylight, and it was apparently witnessed by several individuals who reported what they saw to the police.

On October 16, 1995, Detective Dwayne Corbett of the Metropolitan Police Department (MPD) was investigating Harris' murder. Having received a lead that a man named Tony may have been involved,[2] as well as a description of the suspect, Corbett and a colleague set up surveillance in Suitland, Maryland. A man who apparently matched the suspect's description

---

1. This factual narrative is based primarily on the testimony of Detective Dwayne Corbett at the hearing on Thomas' pretrial motion, on Thomas' confession to Detective Corbett, and on the government's proffer and Thomas' statements during the plea proceeding.

2. Corbett testified that he believed that the suspect's name was Tony Tompkins, or something like Tompkins.

emerged from an apartment complex and sat down in the passenger seat of a Ford automobile that was parked outside. The person behind the wheel drove off, and the detectives followed the Ford until it came to a stop in the block in southeast Washington, D.C. where Harris had been murdered. Detective Corbett then observed the passenger toss a small marijuana cigarette out of the open car window. Perhaps sensing that this fortuitous occurrence might facilitate his ongoing investigation, Detective Corbett called for assistance over the radio, and he and his colleague ordered the passenger to step out of the car. Corbett also detected a strong odor of marijuana, and he placed the man who had discarded the "reefer" under arrest. Officers recovered additional marijuana from the vehicle and from the suspect's person.

One of the officers asked the suspect his name. The man responded that he was David Phifer, and he produced identification corroborating this claim. Pressing the inquiry, Corbett asked the man whether his name was Tony. The suspect stated that it was not.

The arrested man was transported to the Homicide Division of the MPD, where he was placed in an interview room and handcuffed. Detective Corbett again asked him to identify himself. The suspect reiterated that his name was David Phifer. Corbett asked the man to recite from memory information appearing on the Phifer identification. Remarkably, the

suspect was able to do so. Corbett attempted to verify, through the WALES computer, the information provided by the suspect, but the name "David Phifer" did not "come up." The detective concluded that the arrested man had falsified his identity.

Corbett advised his prisoner of the results of the WALES check, and he told him that he knew his name was not David Phifer. The suspect now responded by claiming that his name was really James Lee Bowser.[3] He provided the detective with a purported address and date of birth for Bowser. After checking this information in the WALES computer, Corbett discovered that it too was false, and he so advised his prisoner.

The suspect next asserted that his name was Stanley Wallace. Once again, Detective Corbett attempted unsuccessfully to verify the new claimed identity. Meanwhile, Sergeant Lyons, Corbett's supervisor in the Homicide Division, was also trying to learn the prisoner's true name. At one point, Sergeant Lyons came into the interview room and said, "I know this guy. This is Tony. What's his last name?" Phifer alias Bowser alias Wallace did not respond to this apparent ruse. Finally, however, after approximately two hours of lying to the police, the prisoner admitted that his name was Tony Thomas.

Upon ascertaining that the fourth name provided by his evasive captive was the correct one,[4] Detective Corbett told Thom-

---

3. The reader will recall that James Lee Bowser was actually the man who was with Thomas when Thomas spotted the decedent with allegedly purloined clothing belonging to Thomas.

4. Although Thomas finally disclosed his true name, limits to his candor apparently remained in place. During the plea proceeding, after the prosecutor had made his proffer, Thomas responded as follows to questions posed to him by the trial judge:

THE COURT: Mr. Thomas, did you know the person, Gerald Harris?
THE DEFENDANT: Yes, sir.
THE COURT: Did you shoot him?
THE DEFENDANT: No, sir.
THE COURT: You did not?
THE DEFENDANT: No, sir.
THE COURT: Do you know who shot him?
THE DEFENDANT: No, sir.
THE COURT: Were you present when he was shot?
THE DEFENDANT: No, sir.

Thomas' attorney asked for a brief recess. When the hearing was resumed, the following transpired:

MS. SUPLER [Counsel for Thomas]: Your Honor, if the court could start again, I think we're ready to proceed with the inquiries to Mr. Thomas.

as that he was a suspect in the murder of Gerald Harris. Thomas asked Corbett why Corbett believed that Thomas was involved in that offense. Corbett explained that he could not discuss the matter with Thomas until after Thomas had been advised of his *Miranda* rights. Corbett then read Thomas his rights from a police PD–47 advice of rights form.

The questions on the PD–47 are: "(1) Have you read or had read to you the warning as to your rights? (2) Do you understand these rights? (3) Do you wish to answer any questions? (4) Are you willing to answer questions without having an attorney present?" After his rights had been read to him, Thomas answered yes to the first three questions, but he wrote "no" in response to the fourth.

Precisely what happened next is in dispute, for Detective Corbett and Mr. Thomas provided slightly different accounts at the hearing on Thomas' motion to suppress. The motions judge, after hearing the testimony of both witnesses, found, *inter alia,* that

the defendant unambiguously responded "no" to the fourth question, that is, whether he was willing to answer questions without an attorney present.

The court further finds, as demonstrated by Detective Corbett's preliminary hearing testimony, his testimony at this proceeding, the defendant's testimony at this proceeding, and the videotape, that the next thing that occurred was that Detective Corbett said that they could not continue to talk about the case because the defendant had written "no" in response to the fourth question.

The court also finds that the defendant then stated that he wanted to talk about it, he wanted to tell the police

what happened, he had to tell the police what happened.

He agreed to mark out the "no." And it appears from the PD–47 that he simply wrote "yes" over the "no" and, at Detective Corbett's request, he initialed the "yes."

After Thomas changed his answer to the fourth question on the PD–47 form from "no" to "yes," Detective Corbett interrogated him about the killing of Gerald Harris. Thomas initially claimed that it was Bowser, and not Thomas, whose apartment had been burglarized and who was principally responsible for Harris' death. Detective Corbett told Thomas that he did not believe this account, and he asked Thomas to submit to a voice-stress analysis "lie detector" test. Thomas agreed, and at the conclusion of a one-hour voice-stress examination, Thomas was told that he had failed. Thomas then advised Detective Corbett that he "really" wanted to tell the police what happened, and he gave Corbett the account of the crime described on page 417, *supra.* Thomas also reiterated his final version in a detailed videotaped confession.

A grand jury indicted Thomas for first degree premeditated murder while armed and related weapons offenses. Thomas moved to suppress his statements on *Miranda* grounds. Following an evidentiary hearing, the motions judge found no *Miranda* violation. Thomas then entered his conditional plea to second-degree murder while armed. The trial judge imposed a sentence of imprisonment for from twenty years to life. This appeal followed.

## II.

### THE INTERROGATION OF THOMAS REGARDING HIS IDENTITY

Thomas argued in the trial court, and continues to maintain on appeal, that the

THE COURT: Sure. Mr. Thomas, did you know Gerald Harris?
THE DEFENDANT: Yes, sir.
THE COURT: Did you shoot Gerald Harris?
THE DEFENDANT: Yes, sir.

THE COURT: Now, a moment ago you said no, you didn't. What's changed?
THE DEFENDANT: Nervous about the situation. I didn't mean to say no, just nervous.

police engaged in impermissible custodial interrogation by questioning Thomas for approximately two hours regarding his true identity without having first advised him of his *Miranda* rights. The motions judge rejected this contention, holding that

the police were not under an obligation to give *Miranda* warnings at that point. It's a normal booking procedure for the police to make sure [of] the identity of the person and to identify—that they couldn't have gone on and questioned him if they hadn't known his true identity.

Therefore, I don't find any obligation at that point—no custodial interrogation of the type that would trigger an obligation on the part of the police to give *Miranda* warnings at that juncture.

Thomas challenges this ruling on two grounds. First, he asserts that the District of Columbia does not recognize a "routine booking question exception" to *Miranda's* proscription of custodial interrogation of a suspect who has not been advised of his rights. Second, Thomas argues that even if such a routine booking question exception is recognized, it does not apply to the present case because the police, rather than asking "booking" questions, were attempting to elicit an incriminating response. We consider each of these contentions in turn.

A. *The existence of the routine booking question exception.*

■ Prior to the Supreme Court's decision in *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), it was the law in this jurisdiction that even "routine" questions to an accused in custody must be preceded by a *Miranda* warning. *See Proctor v. United States,* 131 U.S.App. D.C. 241, 242–43, 404 F.2d 819, 820–21 (1968); *Brewster v. United States,* 271 A.2d 409, 412 n. 6 (D.C. 1970). This court stated in *Brewster* that

whether it is routine is not a relevant consideration. *Miranda* applies to custodial interrogation. Routine questions, no matter how innocuous they may seem, are part of an interrogation. The fact that an interrogation contains nothing but routine questions does not make it any less interrogation; nor, more emphatically, does the quality of routineness suspend fifth amendment rights.

*Id.*

■ "The rule is fundamental in our jurisprudence that no division of this court will overrule a prior decision of this court." *Washington v. Guest Servs.,* 718 A.2d 1071, 1075 (D.C.1998) (quoting *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971)) (internal quotation marks omitted). "This court will not lightly deem one of its decisions to have been implicitly overruled [5] and thus stripped of its precedential authority." *Lee v. United States,* 668 A.2d 822, 828 (D.C.1995).[6] Nevertheless, "[w]e do not believe ... that *M.A.P. v. Ryan* ... obliges us to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Su-

---

5. Nor, for that matter, will we lightly question the continuing vitality of a pre-*M.A.P. v. Ryan* decision of the United States Court of Appeals for the District of Columbia Circuit.

6. The government cites *Townsend v. United States,* 512 A.2d 994 (D.C.1986), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2188, 95 L.Ed.2d 843 (1987). In *Townsend,* this court stated that "[r]outine booking questions are not interrogations for *Miranda* purposes." *Id.* at 1000. There was no discussion in the *Townsend* opinion of the earlier decisions in *Proctor* and *Brewster,* which at that time constituted contrary binding precedent under *M.A.P. v.*

*Ryan.* Indeed, there is no indication in *Townsend* that *Proctor* and *Brewster* were brought to the attention of the court.

Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one. *See Taylor v. First Am. Title Co.,* 477 A.2d 227, 230 (D.C.1984); *Owens v. United States,* 688 A.2d 399, 406–07 (D.C.1996) (Schwelb, J., concurring); *Mims v.. Mims,* 635 A.2d 320, 329 (D.C.1993) (Ferren, J., concurring in part and dissenting in part). The quoted language in *Townsend* therefore does not bind us.

preme Court decisions." *Frendak v. United States,* 408 A.2d 364, 379 n. 27 (D.C. 1979); *accord, Washington, supra,* 718 A.2d at 1075 (quoting *Frendak* ).

In this instance, we conclude that the "philosophical basis" of *Proctor* and *Brewster* has been substantially undermined by *Muniz* and its progeny. In *Muniz,* Justice Brennan, writing for a four-justice plurality, recognized a "routine booking question exception which exempts from *Miranda's* coverage questions [designed] to secure the biographical data necessary to complete booking or pretrial services." 496 U.S. at 601, 110 S.Ct. 2638 (internal quotation marks omitted).[7] The plurality specified that questions posed by the police to the defendant regarding his name, address, height, weight, eye color, date of birth and current age did not qualify as "custodial interrogation." *Id.* Four justices concurred on other grounds without explicitly addressing the existence *vel non* of a pedigree exception. *See id.* at 608, 110 S.Ct. 2638 (Rehnquist, C.J., concurring) ("it is unnecessary to determine whether the questions fall within the 'routine booking question' exception to *Miranda* Justice Brennan recognizes"). Only a single justice disagreed with the plurality's recognition of the exception. *See id.* at 608, 110 S.Ct. 2638 (opinion of Marshall, J., concurring in part and dissenting in part).

Notwithstanding the fact that Justice Brennan's plurality opinion was not technically an opinion of the Court, the routine booking question exception has been uniformly recognized since *Muniz* by the federal and state courts. *See, e.g., United States v. Duarte,* 160 F.3d 80, 81 (1st Cir.1998) (per curiam); *United States v.*

*Montana,* 958 F.2d 516, 518 (2d Cir.1992); *United States v. D'Anjou,* 16 F.3d 604, 608 (4th Cir.), *cert. denied,* 512 U.S. 1242, 114 S.Ct. 2754, 129 L.Ed.2d 871 (1994); *United States v. Clark,* 982 F.2d 965, 968 (6th Cir.1993); *United States v. Leung,* 929 F.2d 1204, 1209 (7th Cir.), *cert. denied,* 502 U.S. 906, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991); *United States v. Brown,* 101 F.3d 1272, 1274 (8th Cir.1996); *United States v. Henley,* 984 F.2d 1040, 1042 (9th Cir.1993); *United States v. Parra,* 2 F.3d 1058, 1067–68 (10th Cir.), *cert. denied,* 510 U.S. 1026, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993); *Franks v. State,* 268 Ga. 238, 486 S.E.2d 594, 597 (1997); *Hughes v. State,* 346 Md. 80, 695 A.2d 132, 140(Md.), *cert. denied,* —— U.S. ——, 118 S.Ct. 459, 139 L.Ed.2d 393 (1997); *Commonwealth v. White,* 422 Mass. 487, 663 N.E.2d 834, 844 (1996); *People v. Rodney, supra* note 7, at 473; *State v. Stevens,* 181 Wis.2d 410, 511 N.W.2d 591, 599 (1994), *cert. denied,* 515 U.S. 1102, 115 S.Ct. 2245, 132 L.Ed.2d 254 (1995).[8] Thomas has not directed our attention to any contrary post-*Muniz* authority, and we are aware of none. Under these circumstances, we consider it appropriate to recognize a routine booking question exception to *Miranda's* restrictions on custodial interrogation.

B. *The applicability of the exception.*

█ The more difficult issue is whether, under the circumstances of this case, this exception justified Detective Corbett's failure to advise Thomas of his rights prior to questioning him at length regarding his identity. According to Thomas, the government's evidence at the motions hearing established, as a matter of law, that the protracted interrogation of Thomas which

---

**7.** Some courts refer to the routine booking question exception as the "pedigree" exception. *See, e.g., People v. Rodney,* 85 N.Y.2d 289, 624 N.Y.S.2d 95, 648 N.E.2d 471, 473 (1995).

**8.** Recognition of such an exception might also be inferred from the language in the court's opinion in *United States v. Walls,* 315 U.S.App.D.C. 111, 114, 70 F.3d 1323, 1326

(1995), *cert. denied,* 517 U.S. 1147, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996), but the issue does not appear to have been squarely presented. *See also United States v. Menichino,* 497 F.2d 935, 939–41 (5th Cir.1974); *United States v.. Glen–Archila,* 677 F.2d 809, 816 n. 18 (11th Cir.), *cert. denied,* 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982).

preceded the advice of rights was not a booking procedure, and that, on the contrary, the police, in interrogating their prisoner, were seeking to elicit from him an incriminating acknowledgment that his name was Tony—the first name of the man whom they had followed from Suitland, who apparently matched the description of the suspect, and who was believed by police to be the murderer of Gerald Harris.[9]

Detective Corbett's testimony at the motions hearing provides substantial support for Thomas' position. The detectives' encounter with Thomas was indisputably precipitated by their interest in exploring the murder of Gerald Harris and Thomas' role in it. Detective Corbett, a homicide detective, set up surveillance in Maryland to identify a suspect for whom he had a description and the name "Tony Tompkins," or something like Tompkins. Corbett followed a man whom he believed to be Tony into the District and, after arresting him for a marijuana offense, transported him to the Homicide Division for questioning.

At the arrest scene, Thomas had given an alias and had denied that his name was Tony. As a result, the police now had a suspect who apparently fit the description of Harris' murderer. Indeed, they had just arrested this suspect in the very block where Harris was killed. What the police lacked, however, was confirmation of the other significant part of their information, i.e., that the suspect's first name was Tony. If it turned out that the name of the man who called himself David Phifer was really Tony, and especially if his last name was something like Tompkins, then this would provide the police with important corroboration of their lead, and thus "a link in the chain of evidence" against the suspect. Hoffman, supra note 9, 341 U.S.

at 486, 71 S.Ct. 814. It was therefore entirely logical for Detective Corbett and his colleagues to focus their attention on "David Phifer's" true identity.

Nothing that Detective Corbett did after Thomas' arrival at the Homicide Division reflected any interest in "booking" Thomas for the marijuana offense which he had fortuitously and improvidently committed in the presence of the police. Corbett did not claim in his testimony that he was completing any standard booking form during the interrogation regarding Thomas' identity. There was no evidence that Thomas was being fingerprinted or photographed. On the contrary, the entire two hours of questioning were devoted to breaking down Thomas' insistence that his name was not Tony. In addition, Sergeant Lyons employed an apparent ruse to induce Thomas to admit that he was Tony. Finally, after Thomas abandoned the last of his three aliases and acknowledged that his name was Tony Thomas, the interrogation turned to the Harris murder (for which Thomas had not been arrested and could not have been "booked") rather than to the marijuana offense to which any routine booking procedure would logically have applied.

The foregoing facts being essentially undisputed, "[t]he question whether [Thomas'] rights were scrupulously honored, including whether police conduct constitutes interrogation, is a question of law." Stewart v. United States, 668 A.2d 857, 863 & n. 5 (D.C.1995). Accordingly, we review de novo the motions judge's determination that the interrogation of Thomas regarding his identity did not violate the strictures of Miranda. Although we are not prepared to hold that the police must advise a suspect of his Miranda rights before even asking him his name,[10]

9. Cf. Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951): "The privilege [against self-incrimination] not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which

would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."

10. Cf. St. George v. State, 564 So.2d 152, 155 (Fla.Ct.App. 5th Dist.1990) (en banc), holding

and although protection of Thomas from the inference of consciousness of guilt generated by two hours of fabricating aliases might reasonably be viewed as providing him with an undeserved windfall,[11] we are unable to conclude that the extended interrogation of Thomas in this case falls within the rubric of the exception from *Miranda* for routine booking questions. Indeed, the relevant authorities are overwhelmingly to the contrary.

In *Muniz,* the case in which a plurality of the Supreme Court recognized the routine booking question exception, Justice Brennan sounded an important *caveat:*

> As *amicus* United States explains, "[r]ecognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions."

496 U.S. at 602 n. 14, 110 S.Ct. 2638 (citations omitted). Consistently with *Muniz,* the Maryland Court of Appeals has explained that, "[e]ven if a question appears innocuous on its face, . . . it may be beyond the scope of the routine booking question exception if the officer knows or should know that the question is reasonably likely to elicit an incriminating response." *Hughes, supra,* 695 A.2d at 140;

*accord, White, supra,* 663 N.E.2d at 845. "[T]he People may not rely on the pedigree exception if the questions, though facially appropriate, are likely to elicit incriminating admissions because of the circumstances of the particular case." *Rodney, supra,* 624 N.Y.S.2d 95, 648 N.E.2d at 474.[12] The determination whether the exception applies in any given factual context requires an inquiry into the "totality of circumstances." *Franks, supra,* 486 S.E.2d at 597.

In *United States v. Parra,* 2 F.3d 1058 (10th Cir.), *cert. denied,* 510 U.S. 1026, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993), Jose Alfredo Sotelo, who was in state custody on a narcotics charge, told Godshall, an agent of the Immigration and Naturalization Service (INS), that his name was Duarte. Godshall subsequently encountered Sotelo in a booking area and, without advising Sotelo of his rights, asked him: "How is it going, Jose?"[13] Sotelo responded affirmatively. Godshall pressed him: "So that's your name, Jose. It's not Ricardo Duarte?" *Id.* at 1067. Sotelo then admitted his true name. Sotelo was subsequently convicted, *inter alia,* of charges of being an illegal alien in possession of firearms. The Court of Appeals held that the INS agent's interrogation of Sotelo was in violation of *Miranda.* The court explicitly rejected the government's reliance on the routine booking question exception:

> that the Fifth Amendment's privilege against self-incrimination protects a defendant from being compelled to provide verbally any information concerning his identity.

**11.** We have held that a suspect's false response to the police regarding his identity can support an inference of consciousness of guilt. *See, e.g., Earle v. United States,* 612 A.2d 1258, 1269 (D.C.1992); *Van Ness v. United States,* 568 A.2d 1079, 1083 (D.C.1990).

**12.** The articulation of the relevant test in *Hughes* and *Rodney* differs somewhat from the *Muniz* plurality's "designed to elicit incriminatory admissions," but is consistent with the Supreme Court's observation in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100

> S.Ct. 1682, 64 L.Ed.2d 297 (1980), that "a practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." The distinction is not relevant to this appeal, for either test would be satisfied on this record. In any event, "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 302 n. 7, 100 S.Ct. 1682.

**13.** The reader will doubtless note the similarity between Godshall's question to Sotelo and Sergeant Lyons' intervention in the present case.

The underlying rationale for the exception is that routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses. As the Muniz plurality itself recognized, "the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." 496 U.S. at 602 n. 14, 110 S.Ct. 2638.... Thus, where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of Miranda. *See United States v. Henley,* 984 F.2d 1040, 1042 (9th Cir.1993). In this case, Agent Godshall did not question Sotelo to obtain general booking information. Rather, he questioned Sotelo about his true name for the direct and admitted purpose of linking Sotelo to his incriminating immigration file. Under these circumstances, the questioning was reasonably likely to elicit incriminating information relevant to establishing an essential element necessary for a conviction of being an illegal alien in possession of a firearm.

2 F.3d at 1068 (citations omitted).[14]

In *Timbers v. Commonwealth,* 28 Va. App. 187, 503 S.E.2d 233 (1998), the defendant, Kelly Yvette Timbers, who had been arrested for unlawful possession of cocaine and was being fingerprinted, gave her name as "Gwendolyn Ann Timbers." She signed the fingerprint card, as well as another official form, with the name "Gwendy Timbers". A woman later came to the station to deliver a change of clothes for "Kelly" Timbers. A deputy sheriff, MacFall, went to the holding cell where the defendant was being held and called her "Kelly."[15] When the defendant responded to this name, MacFall asked her to tell him her true name. The defendant acknowledged that her name was really Kelly Timbers, and she was subsequently charged with forgery for providing a false name in relation to her fingerprint records. The court held that MacFall's actions constituted custodial interrogation in violation of *Miranda,* and rejected the prosecution's contention that the pedigree exception applied:

> Assuming without deciding that a routine booking question exception exists in Virginia, MacFall's interrogation of appellant does not fall within the exception. Most importantly, MacFall did not confront appellant in the holding cell to clarify an ambiguity in her statements made during booking; rather, he sought to investigate what he believed to be false information. In addition, MacFall's statement that if appellant had given a false name, she needed to come forward with that information, can hardly be considered a routine booking question. Finally, MacFall's interrogation of appellant does not fall under a routine booking question because a reasonable observer would view MacFall's statements as designed to elicit appellant's incriminating statement that she was, in fact, Kelly Timbers.

*Id.* at 238 (citation omitted).[16]

In *State v. Stevens, supra,* the defendant was taken into custody at his home during

**14.** Sotelo's conviction was affirmed, however, because the court concluded that the error was harmless.

**15.** This tactic, too, was similar to Sergeant Lyons' ruse in the present case.

**16.** The prosecution argued in *Timbers* that the police had the defendant's fingerprints, that her true identity would have been discovered without difficulty, and that the evidence that Ms. Timbers gave a false name should have been admitted under the "inevitable discovery" doctrine of *Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). *Timbers, supra,* 503 S.E.2d at 239. The court questioned whether the inevitable discovery rule applied to *Miranda* violations, but concluded in any event that the prosecution had failed to prove the elements of the doctrine. *Id.* In the present case, Thomas is not seeking the suppression of his true name (which arguably might inevitably have been discovered). On the contrary, the part of his

the execution of a search warrant. Narcotics and weapons were recovered in the house. On the scene, officers asked the defendant his name and whether he lived on the premises. The defendant initially gave his name as Zeke, but then stated (accurately) that he was Bruce Stevens. He admitted that he lived in the house. The Supreme Court of Wisconsin held that the interrogation of the defendant regarding his name and residence was prohibited by *Miranda*, and that the defendant's responses to these questions must be suppressed. The court adopted the routine booking question exception, but held that it did not apply under the circumstances presented:

> The defendant made the statements regarding his name and residence during the arrest, not during the booking process. Although at least one court has applied the exception to statements made by a defendant while he was in a police car on his way to the police station, [*United States ex rel Hines v.*] *LaVallee*, 521 F.2d [1109], 1113 [ (2d Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976) ], this court will not extend the exception to incriminating questions asked at the time of the arrest.

Furthermore, while it is impossible to determine the officer's intent from the record, it appears that the questions at issue may have been intended to elicit incriminating responses.[17] Although the question concerning the defendant's name seems innocuous, it may actually have been incriminating. The affidavit submitted in support of the search warrant referred to one of the suspected drug dealers only as "Zeke." As a result, the defendant's answer to the question about his name, "Zeke" and then "Bruce Stevens," identified the defendant as the alleged drug dealer discussed in the affidavit.

511 N.W.2d at 599. The court also held that the question whether Stevens lived in the house was potentially incriminating, as contraband had been found inside, and concluded that "the defendant's statements about his name and residence, made before he received his *Miranda* warnings, are inadmissible." *Id.* (footnote omitted).

In *United States v. Brown, supra*, on the other hand, the court held that the interrogation of the defendant, Jimmy Brown, regarding his identity did not run afoul of *Miranda*. When police asked Brown his name following his arrest on a narcotics charge, Brown falsely claimed that he was Marlus Singleton. Brown subsequently moved to suppress evidence that he had used an alias, asserting that he had been interrogated without first having been advised of his *Miranda* rights. In sustaining the trial judge's denial of Brown's motion, the court stated:

> [Brown's] name was not directly relevant to the substantive offense charged, but wholly incidental. His name was necessary to the booking process, and the question was not investigative in na-

---

motion dealing with the questioning which preceded the advice of rights is directed to Thomas' lies about his identity and to the inference of consciousness of guilt generated thereby. There is no logical connection between Thomas' use of aliases and the inevitable discovery doctrine, and no party has raised the issue.

**17.** In light of our disposition of the appeal on other grounds, we need not determine which authority—*Stevens* or *LaVallee*—this court would follow with respect to the applicability of the pedigree exception to identification questions posed to a suspect at the time of his arrest. We likewise need not decide whether

*Miranda* warnings would have been required before a single inquiry at the police station with regard to Thomas' name, for in this case, protracted interrogation regarding that subject continued at the Homicide Division; the police were obviously seeking an incriminating response and knew or should have known that further questions were likely to elicit one. Indeed, Thomas does not contend that evidence of his use of an alias at the arrest scene should be excluded; he states in his appellate brief that "[t]he two-hour custodial interrogation *at Homicide* regarding his identity was not preceded by *Miranda* warnings; the false names he gave in response must be suppressed." (Emphasis added.)

ture. *If Brown had merely provided his true name, the information would not have been incriminating.* Clearly, this falls within the routine booking question exception.

101 F.3d at 1274 (emphasis added).[18]

In our view, the present case is similar to *Parra, Timbers* and *Stevens,* but distinguishable from *Brown* and *D'Anjou.* In this case, as in *Parra* and *Timbers* (and, to some extent, in *Stevens* ) the police, seeking an incriminatory statement, continued to interrogate the defendant about his identity after he had provided them with a false (or, in *Stevens,* incomplete) name. This case differs from *Brown* and *D'Anjou,* on the other hand, because in those cases the defendants were being asked about their names or other personal data for the first time.[19]

We conclude that the extensive questioning of Thomas at the Homicide Division regarding his identity constituted custodial interrogation conducted in violation of *Miranda.* Evidence of Thomas' use of aliases during that interrogation therefore should have been suppressed.[20]

## III.

### THOMAS' INVOCATION OF THE RIGHT TO COUNSEL

Thomas also contends that the motions judge should have suppressed the state-

ments that Thomas made after he was advised of his rights. He claims that after he had indicated on the PD–47 card that he was not willing to answer questions without an attorney, the police did not scrupulously honor his invocation of his right to counsel, but instead proceeded to interrogate him, in violation of the prophylactic rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We do not agree.

■ We recently had occasion in *Morris v. United States,* 728 A.2d 1210, 1213–22 (D.C. 1999); *see also id.* at 1226–29 (opinion of Terry, J., concurring in part and dissenting in part), to discuss *Edwards* and its progeny in some detail. We reiterated in *Morris* that where, as in this case, a suspect has refused to answer questions without an attorney being present, any subsequent response by the suspect to custodial interrogation must be suppressed unless the prosecution demonstrates

1. that the suspect has initiated further communications or discussions with the police, and

2. that he has knowingly, intelligently and voluntarily waived his right to counsel.

*Morris,* at 1217; *see also id.* at 1226 (opinion of Terry, J.). In the present case, the motions judge resolved these issues in the government's favor. We discern no error.

---

18. In *United States v. D'Anjou, supra,* the court rejected a *Miranda* challenge for reasons similar to those articulated by the court in *Brown:*

> D'Anjou's arguments center on [an INS agent's] questioning regarding his nationality and his address. In this instance, D'Anjou was a legal resident alien, and *there was no incriminatory element of the questioning until D'Anjou began supplying false information regarding his citizenship and place of birth.* Because the incriminatory element was created by D'Anjou himself through his non-truthful responses, this case is unlike those in which a truthful response would in fact be incriminating and where the justification for an exception would be more persuasive.

16 F.3d at 609 (emphasis added).

19. *See also* the language we have italicized in the quotations from *Brown,* 101 F.3d at 1274, and *D'Anjou,* 16 F.3d at 609, for additional distinctions between those cases and this one.

20. Thomas does not contend that the admissions that he made after being advised of his rights, including his videotaped confession, should have been suppressed on account of the questioning regarding his identity that preceded the advice of rights. We therefore do not address the question whether the confession could fairly be regarded as a "fruit of the poisonous tree." *See, e.g., Oregon v. Elstad,* 470 U.S. 298, 303–11, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *cf. Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## A. *Initiation by the accused.*

 Thomas asserts that the police, and not Thomas, initiated the discussions that followed Thomas' original negative response to the fourth question on the PD–47 rights card, relating to his willingness to answer questions without an attorney. The judge found, to the contrary, that

> the defendant initiated further communication by stating, after being told by Detective Corbett that they had to stop talking because he wrote "no" to the fourth question, stating that he wanted to talk, he wanted to tell the police what happened.

Thomas concedes that the judge's finding is supported by the evidence, but claims that, in context, Corbett's response to Thomas' invocation of rights—specifically, Corbett's statement that there could be no further discussion of the case because Thomas had answered the fourth question on the PD–47 in the negative—amounted to interrogation within the meaning of *Rhode Island v. Innis, supra* note 12, 446 U.S. at 301, 100 S.Ct. 1682. We believe that the judge's resolution of this issue was right on the mark:

> Turning to the facts of this case, no common-sense understanding of what Detective Corbett did after Mr. Thomas wrote "no" to the fourth question can be construed as a question or an interrogation. He simply stated the reality. The questioning had to stop now. They couldn't talk any more because Mr. Thomas wrote "no" to the fourth question.
>
> That's not a question. It's not a declarative sentence that can be construed as an interrogative sentence. We know there are some kinds of conduct that have been found in Supreme Court decisions and the decisions of the lower courts to constitute a question, even though they're not asked as a question.
>
> This doesn't fall into that category. This is a simple statement by the detective that questioning has to stop because

the defendant had answered "no" to the fourth question.

> What happens next, again, in any common-sense understanding of what Mr. Thomas did, has to be considered an initiation by the defendant of further conversation, exchanges, or communications with the police.
>
> Very simply: Mr. Thomas wanted to talk. He wanted to talk about this case. That desire came out over and over again in his own testimony at this hearing. He admitted that he wanted to know why the police considered him a suspect, and he understood that the only way he was going to get that question answered was by giving a statement.

We recently reiterated in *Morris* that the "motivating factor" behind *Edwards* is to discourage police interference with the exercise of the right to counsel. At 1222 (citation omitted). We noted that in *Edwards,* officials had extensively badgered the defendant to persuade him to waive his rights, and that the prophylactic rule of that case was "designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." *Id.* at 1221 (quoting *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion)). We went on to hold that, in the absence of police badgering or interference with the exercise of the right to counsel of the kind that occurred in *Edwards,* the prophylactic doctrine of that case should not be expansively interpreted to apply, out of context, to situations critically different from the circumstances before the Supreme Court. *Id.* at 1222 (citation omitted). To treat Detective Corbett's statement that he would, in effect, *comply* with the *Edwards* rule (by not questioning Thomas further) as a *violation* of that rule would expand the decision in *Edwards* beyond recognition, and it would compel officers to walk a perilous tightrope; almost anything they said or did in response to a suspect's invocation of the right to counsel could lead to suppression of a voluntary confession, even

if the suspect fully understood his rights.[21] *Edwards'* prophylactic rule was intended to serve as a protection of the right to counsel, not as a "heads I win, tails you lose" trap for the conscientious officer.[22]

## B. *Waiver.*

■ The motions judge also found that Thomas waived his right to counsel knowingly, intelligently, and voluntarily. There was ample evidence to support that finding.

The testimony established, and the judge found, that on the day of his arrest, Thomas was not quite twenty-four years old. Thomas had completed the eleventh grade. The judge found that Thomas had been arrested and advised of his rights on three or four previous occasions, and had executed PD–47's in connection with some of these arrests. According to the judge, the videotaped confession "presents the defendant as a careful, articulate person, capable of expressing himself precisely and in considerable verbal detail." Defense counsel did not contend that Thomas lacked the ability to comprehend fully the *Miranda* warnings that were given to him, and the judge found that Thomas obviously had that ability. Indeed, Thomas acknowledged during his testimony at the motions hearing that he was familiar with the questions on the rights card, that he understood that he had a choice not to talk to Detective Corbett, that he was not forced to say anything, and that "I was treated good." In this case, as in *Morris*,

at 1220, "[t]here was thus ample evidence to support the Judge's finding that [Thomas] not only knew what his rights were but had also successfully exercised them in the recent past." [23]

The judge also found that Thomas made his videotaped statement freely and voluntarily. This is hardly subject to dispute. Thomas testified that he felt deep remorse for the killing and that he had prayed and cried about it. He explained that it was important to him to have an opportunity to tell his side of the story to the police. As the judge explained, it was

> clear that the defendant wanted to talk, and it is nowhere more clear than in his immediate initiation of further conversation after the detective said, look, we've got to stop talking, when [Thomas] says, no I want to talk, I want to tell you what happened.

We held in *Morris* that, notwithstanding the defendant's negative response to question 4, the evidence relating to his state of mind supported the judge's finding that the defendant's waiver of the right to counsel was voluntary and intentional. The result must be the same here. There is not the slightest evidence that Thomas' confession was coerced; indeed, his own testimony was to the contrary. As Justice Scalia wrote for the Court in *McNeil v. Wisconsin*, 501 U.S. 171, 181, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good." If the police did not have that ability, then

21. Detective Corbett knew that Thomas wanted to learn what information the police had about Thomas' role in the *Harris* murder. If Corbett had abruptly left after Thomas invoked his rights, without giving Thomas the information he wanted, then Corbett's unexplained departure might well have been assailed as an implied expression of displeasure with Thomas for refusing to answer questions without an attorney, and as pressure on Thomas to change his response to question 4 on the PD–47 to an affirmative one.

22. *Smith v. United States*, 529 A.2d 312 (D.C. 1987), on which Thomas relies, does not support his position. In that case, the defendant answered "no" to the fourth question on the

PD–47. The detective undertook to "clarify" this unambiguous response, and inquired further regarding the defendant's intention. In other words, as Judge Terry pointed out in his separate opinion, the detective "asked one question too many." *Id.* at 319. In this case, Detective Corbett did not ask any question at all in response to Thomas' invocation of his rights.

23. On at least one occasion, in connection with a 1994 assault charge, Thomas had written "no" in response to the fourth question on the PD–47, thus exercising his right to decline to answer questions without an attorney being present.

"society would be the loser." *Id.* "Admissions of guilt resulting from valid *Miranda* waivers are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (internal quotation marks omitted)). We conclude that the motions judge properly declined to suppress those of Thomas' statements, including his videotaped confession, which were made after Thomas was advised of his rights.

## IV.

## CONCLUSION

Following the entry of a conditional guilty plea, "[a] defendant who prevails on

appeal shall be allowed to withdraw the plea." Super. Ct.Crim. R. 11(a)(2). In this case, we have concluded that the motions judge's decision not to suppress Thomas' use of aliases was erroneous. Accordingly, the case is remanded to the trial court with directions to permit Thomas, if he so elects, to withdraw his plea.[24]

*So ordered.*

24. This court having declined to order the suppression of Thomas' videotaped confession, Thomas may not find it to be to his advantage to withdraw his guilty plea and thus to revive the very serious charges which the government dismissed as part of the plea bargain. See page 419, *supra.* At any future trial, the jury would learn of the confession and would even be apprised of Thomas' use of an alias at the arrest scene; only the lies that he told at the Homicide Division would be excluded. If, under these circumstances, Thomas decides to adhere to the plea agreement, then he will have secured a ruling from this court requiring the suppression of some of his aliases even though that ruling will have no real effect on his case—as a practical matter, the tail may to some extent be wagging the dog.

If Thomas had sought to condition his guilty plea solely on the appellate disposition of a motion to suppress three of four aliases, it is most unlikely that the plea agreement would have been approved. "[The] requirement of court approval [of conditional pleas] is designed to ensure that the pretrial issues reserved for appeal are case-dispositive." *United States v. Bell,* 966 F.2d 914, 916 (5th Cir.1992); *see also State v. Hodge,* 118 N.M. 410, 882 P.2d 1, 7 (1994). We do not believe, given the evidence as a whole, that the deci-

sion whether or not to suppress the three aliases, standing alone, was case-dispositive, or that the trial judge would have regarded it as potentially decisive.

Given this reality, this court could initially confine its consideration of the case to Thomas' most important request, namely, that his confession be suppressed, and could elect in the present posture of the proceedings to decide only that issue. We could then remand the case to the trial court for a determination whether, in light of this court's rejection of the defense's position as to the confession, Thomas is now ready to accept the plea agreement unconditionally and to withdraw the part of his motion dealing with his aliases. No party has asked us to segregate the issues in this way, however, or to rule only on one of the two discrete questions raised by Thomas on appeal. Both issues have been extensively briefed and argued and are ready for decision. Although we take no position at all on a question that has not been briefed or argued, we note one court's statement that "[i]f *any* ruling that forms a basis for the conditional plea is found to be erroneous, we are required to permit the defendant to withdraw his plea." *United States v. Mejia,* 69 F.3d 309, 317 n. 8 (9th Cir.1995) (emphasis in original). In the absence of a request to decide only one of the two issues, we take the case as it has been presented to us.