**Dennis G. SMITH, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85–729.**

District of Columbia Court of Appeals.

Argued June 10, 1987.

Decided Aug. 10, 1987.

Jamie S. Gardner, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Robert L. Bredhoff, Asst. U.S. Attys., were on the brief, for appellee.

Before NEWMAN, BELSON, and TERRY, Associate Judges.

NEWMAN, Associate Judge:

Dennis Smith was convicted after a jury trial of second degree murder while armed. Before trial, Smith moved to suppress statements he made to the police following his arrest. The motion was denied; the statements were admitted in evidence at trial. Smith contends that the statements, having been obtained by the police in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), should have been suppressed. We agree and reverse.[1]

I

At the pre-trial suppression hearing, the government's primary witness was Officer William E. Corboy of the Metropolitan Police Department. Corboy testified that he was placed in charge of investigating the death of Elijah Gerald on May 28, 1984, and that on the basis of information obtained from the decedent's brother, Robert Gerald, he obtained an arrest warrant for appellant Dennis Smith and a search warrant for Smith's residence in Southeast Washington, D.C. Corboy arrived at the residence with two other officers and placed Smith under arrest. Smith volunteered to Corboy that the decedent had come at him with a hawk-billed knife, that he had been afraid, and that he had retrieved the knife and put it in a drawer.

Corboy then advised Smith that he had a warrant to search the home for a baseball bat, the alleged murder weapon, and asked him where it was. After Smith directed Corboy to his bedroom closet, another officer recovered the bat. Corboy then delivered Smith into the custody of the two accompanying officers, instructing them not to have any conversation with Smith on their way to police headquarters. Smith was transported to the homicide office at police headquarters.

Corboy returned to police headquarters about an hour later and joined Smith in the interview room. He asked Smith to listen to what he had to say without speaking, and proceeded to recite briefly the circumstances leading up to Smith's arrest. During this explanation, and despite Corboy's admonition to remain silent, Smith inter-

---

1. Smith also urges reversal upon two other grounds, maintaining first that the trial judge, by conducting his own examination of witnesses on several occasions, improperly placed himself on the side of the prosecution, and second that the prosecutor committed misconduct by commenting to the jury on the credibility of witnesses and misstating the evidence. Because we reverse Smith's conviction on the basis of *Miranda* violations, we do not reach these other claims.

rupted to tell Corboy that he should talk to his wife, Edna Smith, and his mother-in-law, Inez Williams. After reiterating that Smith should not speak until he was finished, Corboy completed his explanation.

Corboy then produced standard police department form PD 47, the "advice and waiver of rights card." He asked Smith if he could read; Smith replied that he read very little. Corboy placed the rights card between them and read the *Miranda* warnings aloud. Then he turned the card over, showed Smith the questions written on the back, and read each of them aloud.[2] Smith answered "Yes" to the first three questions, but when asked the fourth, "Are you willing to answer questions without having an attorney present?", Smith replied, "No."

Corboy testified that he was surprised by this answer because Smith had indicated in response to question number three that he wished to talk. Adding to this impression was the fact that Smith had been nodding his head while being read his rights, and that before, when Corboy was explaining the circumstances leading up to his arrest, Smith had interrupted despite being told not to speak. Therefore, "to make sure we both understood what his answer was," Corboy "asked him again, are you saying, are you willing to answer any questions without having a lawyer present; and are you saying you don't want to answer any questions?" Smith responded, "[y]es, I want to answer questions." Corboy then "cleared up this area, asked him an additional question or two...." When Corboy asked Smith why he had answered "no", Smith explained that he had been confused. Corboy asked the third and fourth questions again, and Smith replied affirmatively to each. Corboy gave the card to Smith, who wrote "yes" next to each question and signed the card. Smith then gave a statement containing his version of the events

leading up to the death of Elijah Gerald. With his consent, the statement was recorded on videotape.

Following the evidentiary hearing, the trial court denied Smith's motion to suppress the videotaped statement,[3] simply stating its finding that there was no violation of *Miranda,* and that the statement was voluntarily made.

At trial, the government attempted to show that following a disagreement between Smith and Elijah Gerald, who lived at the same address, Smith hit Gerald on the side of the head with a baseball bat, inflicting a fatal injury. The government's primary witness was Robert Gerald, the decedent's brother, who also lived at that address. Gerald related that he was sitting at the kitchen table drinking vodka when he heard two men coming down the stairs arguing, and then heard something fall. When he went into the living room, he saw his brother Elijah lying on the floor with a cut over his eye, and Dennis Smith standing nearby holding a baseball bat, saying, "Come on, too, if you want some of it." After Robert had helped Elijah to his feet, Elijah went back upstairs. Robert did not see a knife in his brother's hand when he helped him up, nor did he see one on the floor afterward. About a half hour later, Inez Williams, a friend of Elijah who also lived at that address, went upstairs, then called to Robert. Robert went upstairs and found his brother on the floor unconscious. An ambulance was called and Elijah was taken to the hospital, where he died two days later.

The government also called as a witness the medical examiner, who testified that the cause of death was an injury to the head caused by one blow with a blunt instrument. Detective Corboy testified, in a fashion similar to his testimony at the suppression hearing, as to the circumstances

---

2. The questions on the back of the PD 47 form are as follows:
   1. Have you read or had read to you the warning as to your rights?
   2. Do you understand these rights?
   3. Do you wish to answer any questions?
   4. Are you willing to answer questions without having an attorney present?

3. Smith's motion did not request suppression of any of the statements made to Corboy at his residence immediately after his arrest. Nor did Smith object to the admission of any of these statements at trial.

surrounding Smith's arrest and videotaped statement. The videotape was played for the jury. Finally, Crime Scene Search Officer Louis Cooper testified as to his recovery of the baseball bat. It was found in the bedroom closet indicated by Smith. The door to the closet was blocked by large bunk beds which had to be moved in order to open it. Inside the closet was a pile of clothes reaching half way to the ceiling. Removal of the clothes revealed a closed garment bag, inside of which was found the bat.

Dennis Smith, testifying on his own behalf, claimed self-defense. He related that Elijah Gerald habitually became unruly when he was drunk, and that he had often seen Elijah pull a knife at such times; in fact, he had seen Elijah pull a knife on his brother Robert the week preceding the incident in question.

On May 26, 1984, the men of the house, including Smith and Elijah Gerald, had been drinking vodka all day. At about 6:30 in the evening, Robert Gerald and Inez Williams were in the kitchen, and Smith was standing in the living room near the kitchen door, when Elijah Gerald came down the stairs "cussing" and "raising his voice" at Smith. When Elijah reached the bottom of the stairs, he pulled out his knife and came at Smith. Smith retreated to the kitchen, grabbed the children's baseball bat from beside the freezer near the kitchen door, returned to the living room and swung the bat at Elijah, hitting him on the side of the head. He testified that "[t]hat was the only way I could stop him." Smith then picked up Elijah's knife, went upstairs, and put it in his own dresser drawer.[4]

When Smith returned downstairs, Inez Williams was helping Elijah up off the floor, and Robert Gerald was still sitting in the kitchen. Smith then left to go to the store to get cigarettes. He did not offer to help Williams pick Elijah up off the floor

because he was "scared and nervous and ... wanted a cigarette." Later, Smith put the baseball bat in the garment bag under the clothes in the closet barricaded by the bunk beds, because he didn't want the children to play with it without his permission.

Smith admitted on direct examination that his statement to the police, recorded on the videotape which had been played to the jury, had been false in several respects; most notably, he had told Officer Corboy that he had hit Elijah with the bat in the knee, rather than the head.[5] He stated that he had not told the truth because he had been "scared [of] ... going to jail for a long time." He testified that although he had lied to Corboy about hitting Elijah in the knee, his statement that Elijah had been coming at him with a knife was the truth.

Inez Williams, friend of the decedent and mother-in-law of Dennis Smith, testified that she was sitting at the kitchen table with Robert Gerald when she heard someone fall in the living room. She went into the living room and saw Elijah lying on the floor near a stereo console, his head bleeding. She assumed he had fallen down the stairs, rolled into the stereo and hit his head. She helped him up, after which he went upstairs and lay down. She called an ambulance. She did not see a knife on or near Elijah. She testified that at no time pertinent to these events did she see or hear Smith in the area.

Williams was impeached with her grand jury testimony in which she had said that when she went into the living room and found Elijah on the floor, Smith and Robert Gerald were in the room, and Smith had said to Gerald, "[C]ome on, if you want some of it too."

## II

We are persuaded that Smith's videorecorded statement to Officer Corboy was

---

4. No hawk-billed knife was found in that drawer by police. However, Inez Williams provided Officer Corboy with such a knife after Smith's arrest. She had found it in a drawer in another room of the house.

5. In the videotaped statement, Smith had further stated that although Elijah Gerald threatened other people when drunk, Smith had never seen him pull a knife. He had also told Officer Corboy that he was in the kitchen, not the living room, when the incident began.

obtained in violation of *Miranda v. Arizona, supra.* In that case, the Supreme Court held that during a custodial interrogation, if the accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. at 444–45, 86 S.Ct. at 1612. In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court elaborated that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484, 101 S.Ct. at 1885. The Supreme Court has repeatedly emphasized that the rule of *Edwards* is a "bright-line", prophylactic rule, designed to prevent " 'badger[ing]' or 'overreaching' —explicit or subtle, deliberate or unintentional...." *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984); *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631 (1986).

■ Recognizing that all questioning must cease when an accused invokes his right to counsel, the government nevertheless contends that it was uncertain whether Smith *did* invoke that right initially. It is argued that Smith's negative answer when asked if he was willing to speak without a lawyer present was ambiguous, so that Officer Corboy was justified in asking additional questions designed merely to clarify Smith's intentions. We are urged to apply the rule set forth in *Nash v. Estelle,* 597 F.2d 513, 517 (5th Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979), and adopted by several other jurisdictions,[6] that when an accused's assertion of the right to counsel is equivocal or ambiguous, police must cease all interrogation *except* for narrow questions designed to clarify the accused's statement and his or her desires respecting counsel. This court has already expressed its approval of this approach, *Ruffin, supra* note 6, 524 A.2d

at 701; however, Smith's conviction must be reversed even if it is applied.

■ The approach adopted in *Ruffin* and urged upon us in this case is addressed to ambiguities or equivocations which either (1) *precede* an accused's purported request for counsel, or (2) are part of the request *itself. Smith, supra,* 469 U.S. at 96, 105 S.Ct. at 493. Neither situation was present here. No preceding events rendered Smith's "no" ambiguous. Corboy testified that he presumed Smith was willing to talk from statements volunteered by Smith both at his home and at the police station before being read his rights. However, statements volunteered by an accused before being informed of his right to counsel can not be used to cast doubt upon a request for counsel made *after* being so informed. If the individual did not yet know about the right, how could his conduct indicate an intention to waive it? Likewise, neither his shaking his head while being read his rights, nor his response to PD 47 question number three indicating his willingness to talk, could be taken as showing a willingness to talk without a lawyer present. These circumstances did not make his request for counsel equivocal. *Compare Nash, supra,* 597 F.2d at 514–16 (accused had already orally confessed after being read *Miranda* rights; after being read rights a second time said he wanted to talk, then asked, "If I want a lawyer present, I just put down I want him present?"; further questioning merely clarified whether accused actually wanted lawyer); *Thompson v. Wainwright,* 601 F.2d 768, 769–70 (5th Cir.1979) (accused advised of rights, signed waiver card, then said he wanted to make statement, but first wanted to talk to lawyer; further questioning could only clarify request).

Nor was the word "no" itself in any way ambiguous. *Compare Ruffin, supra* note 6, 524 A.2d at 700 (accused asked if police officer thought he needed a lawyer); *People v. Krueger,* 82 Ill.2d 305, 45 Ill.Dec.

---

**6.** *See, e.g.,* cases cited in *Ruffin v. United States,* 524 A.2d 685, 701 (D.C.1987). *See also Smith,*

*supra,* 469 U.S. at 96 n. 3, 105 S.Ct. at 493 n. 3.

186, 187, 412 N.E.2d 537, 538 (1980) ("Maybe I need a lawyer"), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 390 (1981). Although it is conceivable that an individual might say the word "no" with a look or a tone of voice communicating some ambiguity or confusion, Corboy's testimony referred to no such circumstances here. He merely testified that he was "taken aback" and "surprised" at Smith's answer. We have recognized that the investigating officer must exercise his judgment in determining whether the accused has waived his right to counsel. *Ruffin, supra* note 6, 524 A.2d at 701; *see Miranda, supra,* 384 U.S. at 486 n. 55, 86 S.Ct. at 1634 n. 55. However, "the ultimate responsibility for resolving this constitutional question lies with the courts," *id.,* and we decline to accord weight to an officer's subjective impression that a suspect's request for counsel was equivocal, when that impression is unsupported by any objective circumstances appearing in the record. A police officer's frustrated expectation does not suffice.[7]

Officer Corboy may not have been attempting to coerce a statement from Smith. To the contrary, we will assume he was acting in good faith. This is beside the

point, however. "[T]he rule ... announced in *Edwards* ... is a prophylactic safeguard whose application does not turn on whether coercion in fact was employed." *Smith, supra,* 469 U.S. at 99 n. 8, 105 S.Ct. at 495 n. 8. As noted above, the rule is designed to prevent "badgering" or "overreaching", even when unintentional. *Id.* at 98, 105 S.Ct. at 494. This case presents just the type of situation which the rule of *Miranda* and *Edwards* was designed to prevent.

### III

■ Having found that the police violated Smith's *Miranda* rights by continuing to interrogate him after he had invoked his right to counsel, we must determine whether the admission in evidence of his subsequent voluntary[8] statement to the police was harmless beyond a reasonable doubt under the standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Ruffin, supra* note 6, 524 A.2d at 703; *Lewis, supra* note 8, 483 A.2d at 1130–31. That standard requires us to decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman, supra,* 386 U.S. at 23, 87 S.Ct.

---

**7.** Smith's subsequent statement that he was confused about Corboy's meaning cannot be used to cast doubt on the lack of ambiguity in his original response. *Smith, supra,* 469 U.S. at 100, 105 S.Ct. at 495. The government properly eschews any such argument.

**8.** The trial court found that the statement was voluntary. We think the record evidence supports this finding. D.C.Code § 17–305(a) (1981). There was no physical abuse, *see Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); incommunicado detention, *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); nighttime interrogation, *Greenwald v. Wisconsin,* 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); or "trickery", *In re D.A.S.,* 391 A.2d 255 (D.C.1978). Smith was not mentally ill, *see Jackson v. United States,* 404 A.2d 911 (D.C.1979); emotionally unstable, *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); of limited mental capacity, *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); or sick or seriously wounded, *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Though barely able to read or write, Smith was of average mental capability.

His interrogation lasted only 45 minutes, and began within one hour of his arrest; he was offered soda, cigarettes, and use of the bathroom. He was warned, and understood, that he could remain silent and that any evidence taken could be used against him. *See Michigan v. Tucker,* 417 U.S. 433, 444–45, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974). Though police refusal to respect a request for counsel is a factor to be considered in an inquiry into voluntariness, *Culombe v. Connecticut,* 367 U.S. 568, 630, 81 S.Ct. 1860, 1894, 6 L.Ed.2d 1037 (1961), it does not automatically render a subsequent statement involuntary. *Lewis v. United States,* 483 A.2d 1125, 1131 (D.C.1984); *see Tucker, supra,* 417 U.S. at 445–46, 94 S.Ct. at 2364–65. This is especially true when police conduct falls well short of willful misconduct, as it did here. *See id.* at 447, 94 S.Ct. at 2365 (deterrence rationale of exclusionary rule in Fifth Amendment context is less forceful when police conduct is not willful but pursued in good faith). Smith was not told he did not have a right to see his lawyer. *Cf. Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

at 827 (citation omitted). In other words, we must assess whether, once the tainted evidence is excluded from consideration, there remains overwhelming evidence to support the jury's verdict. *Derrington v. United States*, 488 A.2d 1314, 1331 & n. 25 (D.C.1985).

■ In some cases, the tainted evidence to be excised may consist not only of the illegally obtained evidence, but the defendant's testimony as well. If the defendant testified "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Harrison v. United States*, 392 U.S. 219, 223, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968) (footnote omitted). Such tainted testimony "cannot be considered as independent evidence of guilt for purposes of applying the harmless error rule." *Smith v. Estelle*, 527 F.2d 430, 433 (5th Cir.1976), citing *Harrison, supra; People v. Spencer*, 66 Cal.2d 158, 57 Cal. Rptr. 163, 170, 424 P.2d 715, 722 (1967); *Hillard v. State*, 286 Md. 145, 406 A.2d 415, 422 (1979). *See also Lewis, supra* note 8, 483 A.2d at 1133 (harmful error reversal unnecessary under rule of *Harrison*, since appellant's decision to testify was compelled by other evidence besides illegally obtained statement).

We think Smith's testimony was tainted by the introduction of the illegally obtained statement. That statement, conflicting as it did with the medical evidence,[9] left Smith no alternative but to take the stand in the hope of lessening its damaging impact; he had to explain why he had not told the truth to Officer Corboy, and substitute a purportedly true account of the facts. Although other factors may have motivated Smith to testify (for instance, a desire to explain the peculiar manner in which the bat was stored), none compelled him to testify as did the statement.[10] The government has the burden of demonstrating that Smith's decision to testify did not emanate from the receipt in evidence of his illegally obtained statement. *Spencer, supra,* 57 Cal.Rptr. at 170, 424 P.2d at 722; *see generally Chapman, supra,* 386 U.S. at 24, 87 S.Ct. at 828 ("[T]he beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"). It has failed to do so.

■ Excluding from our consideration the videotaped statement and Smith's trial testimony,[11] we do not think the remaining evidence was sufficient to assure that the error of admitting Smith's statement was harmless. The government's case against Smith, reduced to its essence, consisted of the following evidence: (1) Robert Gerald's testimony that he heard two men arguing, saw Elijah Gerald on the floor and Smith standing nearby with a baseball bat, heard Smith make a belligerent statement, and saw no knife in the area; (2) the medical examiner's testimony that death was caused by a blow to the head with a blunt instrument; and (3) police testimony that the bat was found stored in a peculiar manner in a barricaded closet. Although this circumstantial evidence strongly implicated Smith as the murderer, it did little to rebut his claim that the murder was committed in self-defense. This latter function was performed primarily by the tainted evidence, the admission of which could not, therefore, have been harmless beyond a reasonable doubt.

*Reversed.*

---

**9.** Smith had told Corboy that he had struck Elijah Gerald with the bat in the knee. The medical examiner testified that the cause of death was a blow to the head. *See supra* p. ——.

**10.** Smith was not compelled to take the stand in order to present his defense of self-defense, since Officer Corboy had testified for the government that while still at Smith's home, Smith "told me the man was coming at him with a hawk-billed knife. He was afraid of the man." Smith's volunteered statement, the admissibility of which is not challenged, was repeated several times during the course of Corboy's testimony.

**11.** Of course, if Smith had not testified, the videotaped statement could not have been used to impeach him under *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

TERRY, Associate Judge, concurring:

I join in the opinion and judgment of the court. I add these few words to emphasize that our reversal of appellant's conviction is not based on any finding of trickery or deviousness on the part of Detective Corboy. Appellant suggests that Corboy may have acted improperly by instructing the transporting officers not to talk to appellant, or that the manner in which he dealt with appellant may have been slyly designed to elicit a confession that would appear to have been volunteered, and therefore beyond the reach of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record simply does not support such an argument; on the contrary, it makes plain—at least to me— that everything Corboy did was done entirely in good faith. We are reversing appellant's conviction solely because Detective Corboy asked one question too many. Once appellant answered "no" to the fourth question on the PD–47, Corboy should have said nothing more. The confession that resulted from the ensuing conversation must be suppressed under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).