Stevie TINDLE, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–565.

District of Columbia Court of Appeals.

Argued Oct. 26, 2000.
Decided Aug. 16, 2001.

David A. Singleton, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Wilma A.

Lewis, United States Attorney, at the time the brief was filed, and John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and MACK, Senior Judge.

REID, Associate Judge:

In this case, we are asked to determine whether the trial court erred by denying appellant Stevie Tindle's motion to suppress an audio-taped statement given to the police after he signed a Prince George's County, Maryland police department waiver of rights form [1] indicating that he did not want to make a statement without the presence of a lawyer. No lawyer was present during police questioning when Mr. Tindle implicated himself in the stabbing death of Derrick Thrower. At trial, Mr. Tindle's defense was self-defense. Although he was acquitted of the charge of second-degree murder while armed, a jury found him guilty of the lesser included offense of voluntary manslaughter while armed, as well as the offense of carrying a dangerous weapon (knife).[2] He filed a timely appeal, primarily contending that, under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), his audio-taped statement should have been suppressed because his Fifth Amendment right to counsel was violated.

We conclude, as the government candidly concedes, that the trial court erred by failing to suppress Mr. Tindle's audio-taped statement under Miranda/Edwards. In addition, we hold, contrary to the government's position, that Mr. Tindle preserved the claim of error and that, therefore, the constitutional harmless error standard governs Mr. Tindle's case. Finally, we reverse the judgment of the trial court because its error was not harmless beyond a reasonable doubt.

## FACTUAL SUMMARY

Prior to trial, Mr. Tindle filed a motion to suppress his audio-taped statement. In his motion he argued, in part, that he "did not knowingly, intelligently and voluntarily waive his rights pursuant to Miranda, supra." In addition, he maintained that the audiotape "must be excluded from evidence because the method through which [his] statement was obtained violated the prophylactic standards established to prevent compulsory self incrimination." Mr. Tindle also filed a supplemental motion to suppress, asserting, in part, that he "had not waive[d] either his Fifth Amendment right to remain silent or his Fifth Amendment right to counsel." The trial court denied the motions to suppress, and the case proceeded to trial.

The evidence presented at trial showed that Mr. Tindle, Debra White and Shawn Redfield were together, at an Exxon gas station near South Capitol Street and Martin Luther King, Jr. Avenue, in the Southwest quadrant of the District, during the late evening hours of July 21, 1997, and the early morning hours of July 22, 1997. They ate and talked. In addition, Mr. Tindle smoked cigarettes, and Ms. White and Mr. Redfield used crack cocaine.

1. Mr. Tindle was arrested in Prince George's County on Sunday, August 10, 1997, after a District of Columbia warrant had been issued for his arrest. He was questioned on August 11, 1997, in Maryland, by a District of Columbia Metropolitan Police Department detective.

2. An indictment charged Mr. Tindle with second-degree murder while armed, in violation of D.C.Code §§ 22–2403, 3202 (1996), and carrying a dangerous weapon, in violation of § 22–3204(a).

While they were sitting at the Exxon station, Mr. Thrower, who was a friend of Mr. Redfield, approached the three.

The eyewitness accounts as to what happened next varied. However, Mr. Thrower and Mr. Tindle got into a heated argument, which soon turned into a struggle involving pushing and hitting. Ms. White observed Mr. Thrower pushing Mr. Tindle and hitting him in the chest. She saw Mr. Tindle "rock" toward Mr. Thrower twice. Mr. Thrower put his hands on his chest and ran. Blood was on his t-shirt. Mr. Thrower exclaimed: "You jacked me," and started to move toward Mr. Tindle. Mr. Tindle told him, "Get out of here, man." Mr. Redfield recalled that he pulled Mr. Thrower away from the argument, but that Mr. Thrower broke away, ran back to Mr. Tindle and began to argue again. Suddenly, Mr. Thrower ran back toward Mr. Redfield, saying that he had been stabbed.

In his audio-taped statement, which was played for the jury at trial and admitted into evidence, Mr. Tindle recounted his encounter with Mr. Thrower:

> Me and two friends [were] sitting out[side] waiting for [a] car. [A] dude walked by and started talking trash to us.... We told him to go ahead and he went down the street and came back. [He] said, "y'all must know who I am, y'all don't know what I'm going to do to y'all." I was sitting in a squatting position and he sort of like took a swing at me and I backed up and before I knew it, I just stepped up and cut [him and] took off running.

Mr. Tindle was asked: "Where did you get the knife from?" He replied, "I don't remember." In response to the question whether Mr. Thrower had "any weapons on him," Mr. Tindle stated: "I don't know. I don't know."

Latisha Johnson, who reluctantly testified for the defense, was talking on a nearby telephone while observing, "ever so often," the altercation between Mr. Thrower and Mr. Tindle. She indicated that when Mr. Tindle intervened in Mr. Redfield's efforts to give Mr. Thrower a cigarette, Mr. Thrower threatened to "bust" Mr. Tindle, then pushed him, and said he had a gun. Mr. Tindle pushed Mr. Thrower, who fell backwards. Mr. Thrower proceeded to leave the scene. However, when Mr. Thrower ran back toward Mr. Tindle with one hand in his pocket, Mr. Tindle "pulled out his knife and stabbed [him]." [3]

## ANALYSIS

Before determining whether the trial court erred by denying Mr. Tindle's motion to suppress his audio-taped statement because of a violation of his Fifth Amendment right to counsel, we set forth the pertinent factual background for this issue, taken mainly from the hearing on Mr. Tindle's motion to suppress and from his audio-taped statement. After Mr. Tindle was arrested in Prince George's County, Maryland, on August 10, 1997, Metropolitan Police Department Detective Oliver Garvey traveled to Maryland to question him. Detective Garvey arrived shortly before midnight, and spoke to Mr. Tindle beginning around 11:45 p.m. He told Mr. Tindle about the warrant for his arrest for murder. Mr. Tindle "took a deep breath and initially, he denied knowing anything about the incident." Detective Garvey "briefly explained to him that he was posi-

---

3. Ms. Johnson gave conflicting statements as to whether Mr. Thrower had a gun. At trial, she said that Mr. Thrower maintained that he had a gun. However, during her statement at the scene of the incident, and later at the police station on the early morning of the incident, Ms. Johnson made no mention of Mr. Thrower's claim to have a gun. Nor did she mention such a claim in her later written statement, sometime around December 1997.

tively identified and that there are two sides to every story. And if he wanted to explain his side, that this was the opportunity to do so." Detective Garvey testified that, at that point, "Mr. Tindle began to cry, take some deep breaths, made some statements that it's been hard living with this."[4] Detective Garvey stopped Mr. Tindle "to advise him of his rights." Mr. Tindle expressed the fear, "that he would get an overzealous United States Attorney who would not understand what had happened." Detective Garvey "expressed to him that he would have his day in court."

In executing the Maryland version of the waiver form, which is similar to that used in the District, Mr. Tindle initially checked "no" for the question: "Do you want to make a statement at this time without a lawyer."[5] Detective Garvey "told him if you answer that no, I can't talk to you any more." Furthermore, the detective "said[,] take some time to think about whether you want to answer, think about that question."[6] According to Detective Garvey, Mr. Tindle "[b]riefly [ ] thought about it on his own." He then changed his response to "yes," and initialed the change. In response to other questions on the waiver form, Mr. Tindle indicated that he was not "under the influ-ence of drugs or alcohol at this time"; and that he had attended college for two years.

After the waiver form had been modified, Detective Garvey asked Mr. Tindle whether he could tape his statement. When Mr. Tindle acquiesced, Detective Garvey "gave him a few minutes to himself and [ ] explained to him what the conversation would be about."[7] Detective Garvey then started the tape. As Mr. Tindle recounted what happened on the night of July 21, and the early hours of July 22, he and Detective Garvey were alone in the room. Mr. Tindle was crying and upset as he gave his statement. Defense counsel inquired: "Throughout the whole thing, Mr. Tindle appeared to be emotional?" Detective Garvey responded: "Yes, it was very traumatic, yes." In his audio-taped statement, Mr. Tindle said that he had been "shaky" since the incident, and that he was "scared." He mentioned his children "who ain't going to have a father," and began to cry.

During their arguments on the motion to suppress, both the prosecutor and the defense counsel re-visited the factual setting for Mr. Tindle's decision to change his answer as to whether he wanted to give a statement without a lawyer. Both made

---

4. Detective Garvey described Mr. Tindle as "emotional."

5. Detective Garvey identified the four points on the waiver form as: (1) "[Y]ou have the right to remain silent"; (2) "You have the right to talk to a lawyer before you are asked any questions and to have a lawyer with you while being questioned"; (3) "If you want a lawyer but cannot afford one, a lawyer will be provided for you at no cost"; and (4) "If you want to answer questions now without a lawyer, you will still have the right to stop answering questions at any time."

6. On cross-examination, Detective Garvey was asked about his statement to Mr. Tindle: "[T]ake some time to think about whether you want to answer, think about that question."

Defense counsel queried: "[W]hat you said to Mr. Tindle was, in effect, that if he answered no, you would not continue to read the rights card, you would have to stop?" Detective Garvey replied: "No. I told him if he answers no, saying he don't want to answer any questions, the interview would have to stop...." When defense counsel pointed out that once Mr. Tindle had said "no," the detective "could have continued to read his rights, Detective Garvey agreed, but explained that his practice is to stop the interview if the accused does not wish to answer "any questions with or without a lawyer."

7. Detective Garvey did not have to leave the room to search for a tape recorder; it was already in the room.

reference to Detective Garvey's statement that he could not talk to Mr. Tindle since he initially indicated that he did not want to make a statement without the presence of a lawyer. Both addressed whether the waiver was proper as to counsel, and whether Mr. Tindle's statement was voluntary.

With regard to Mr. Tindle's initial indication that he did not wish to make a statement without the presence of counsel, the trial court stated:

> [C]ounsel knows the law. The law is clearly that once a person asks for a lawyer, the police officers, without [ ] the lawyer, without obtaining the lawyer[,] can't ask any more questions. The officer, I believe, acted reasonably in telling the defendant after he said or checked no, what the situation was, that he wouldn't be able to talk to him.... And I think that was correct. The defendant chose to change the answer....

Thus, the trial court determined, in essence, that there was a proper waiver of counsel because: "The defendant chose to change the answer." Furthermore, the trial court implicitly concluded that the waiver was knowing and intelligent because "[Mr. Tindle] had been arrested once before. So I know he had been at least through that part of the process before." In addition, the trial court noted that Mr. Tindle "apparently has two years post high school education .... [and] is not an unintelligent person.... [T]his is an intelligent person who is an adult, who had not been using alcohol, had not been using drugs. There's no indication of any mental or emotional problems." Moreover, the trial court found that there was "no indication from this record to where the officer overbore [Mr. Tindle's] reluctance and, in fact, in any way coerced

him." The judge acknowledged that Mr. Tindle "was a little emotional or was emotional about it," but concluded that "that's totally understandable and I don't think it makes it involuntary."

With this factual context in mind, we begin our analysis of the *Miranda/Edwards* issue by recognizing the government's concession: "[A]s the law now stands, it appears that the remark upon which appellant relies in this Court ["take some time to think about whether you want to answer, think about that question"], although extremely brief and wholly without significant potential to overbear his will, nevertheless violated the *Edwards* rule because it was an effort to 'persuade' him to rethink his initial disinclination to speak with Detective Garvey without counsel present." Having made this concession, however, the government argues that this court's review of the *Miranda/Edwards* issue must be only for plain error because defense counsel failed to present the specific issue concerning Detective Garvey's statement to the trial court.

█ Our review of the record in this matter, and the factual context set forth above, constrains us to disagree with the government. We conclude that Mr. Tindle raised in the trial court, and preserved, the Fifth Amendment right to counsel issue under *Miranda/Edwards*.[8] His written motion to suppress declared that he "did not knowingly, intelligently and voluntarily waive his rights pursuant to *Miranda, supra*," and referenced the "prophylactic standards" of *Miranda*. Moreover, his memorandum in support of his motion stated, in part:

> Mr. Tindle's alleged statement should be suppressed as it was obtained in violation of his Fifth Amendment rights un-

---

8. While the record regarding Mr. Tindle's suppression motion does not explicitly reference *Edwards, supra,* it is clear to us that both

counsel and the trial judge addressed the prophylactic purpose of *Miranda,* as the Supreme Court did in *Edwards, supra.*

der the doctrine of *Miranda* ..., and its progeny. The Fifth Amendment precludes the admission of Mr. Tindle's statement since it was made to the police during a custodial interrogation when he did not knowingly and intelligently waive his privilege against self-incrimination and his right to have retained or appointed counsel present. Nor was the statement made by Mr. Tindle while in police custody the product of a free and unconstrained choice by its maker.

Mr. Tindle also filed a supplemental motion to suppress, in which he asserted:

At the time he allegedly made the oral statement, Mr. Tindle had not waived either his Fifth Amendment right to remain silent or his Fifth Amendment right to counsel. Mr. Tindle's statements were involuntary, and were made in response to custodial interrogation. At the time he made the statements, Mr. Tindle had not waived his rights as required by *Miranda v. Arizona, supra.* Admission of those statements at trial in the government's case-in-chief would therefore violate Mr. Tindle's rights under the Fifth Amendment.

Not only did both the defense and government attorneys discuss the Fifth Amendment counsel issue, including whether it was waived, but they also made arguments concerning the voluntariness of Mr. Tindle's statement. Furthermore, as indicated above, the trial court made specific findings relating to Mr. Tindle's Fifth Amendment right to counsel issue, the alleged waiver, and the voluntariness of Mr. Tindle's statement. While neither the counsel nor the trial judge mentioned *Edwards, supra,* the trial judge specifically articulated the essential legal principle stated in *Edwards:* "The law is clearly that once a person asks for a lawyer, the police officers, without ... obtaining the lawyer can't ask any more questions." Furthermore, the Supreme Court of the United States and this court have distinguished between "claims" and "arguments," holding that although "claims" not presented in the trial court will be forfeited (and thus subject to the plain error review standard), "parties on appeal are not limited to the precise arguments" they made in the trial court. *See, e.g., Salmon v. United States,* 719 A.2d 949, 953 (D.C. 1997); *Yee v. Escondido,* 503 U.S. 519, 534–35, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

In short, we are satisfied that the record before us shows that the trial judge was "fairly apprised as to the question[s] on which [s]he [was] being asked to rule," *Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992); and that Mr. Tindle preserved the *Edwards* issue for our review. Therefore, our review is for constitutional error, within the meaning of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and we must determine whether the trial court's error in not recognizing a violation of the principles set forth in *Miranda* and *Edwards, supra,* and subsequent cases, was harmless beyond a reasonable doubt.

■ Under *Miranda, supra,* an accused has the right to have counsel present during police interrogation. 384 U.S. at 444, 86 S.Ct. 1602. Thus, if the accused asks for an attorney, "the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. 1602. *Edwards, supra,* reiterated the standard relating to the presence of counsel during interrogation, and announced the following fundamental principles:

[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custo-

dial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. 1880 (footnote omitted). *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), recognized several reasons for the *Edwards* principle: (1) " 'to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights,' " *id.* at 150, 111 S.Ct. 486 (quoting *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)); (2) to "ensure[ ] that any statement made in subsequent interrogation is not the result of coercive pressures," *id.* at 151, 111 S.Ct. 486; and (3) to "conserve[ ] judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and [to] implement[ ] the protections of *Miranda* in practical and straight-forward terms." *Id.* Generally, " 'preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny.' " *Id.* at 153, 111 S.Ct. 486 (quoting *Patterson v. Illinois,* 487 U.S. 285, 291, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988)). To stress further the vital importance of the *Edwards* principle, the Supreme Court held in *Minnick, supra,* "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Id.*

■ On the record before us, as the government acknowledges, Mr. Tindle clearly invoked his right to counsel by specifying "no" to the question: "Do you want to make a statement at this time without a lawyer." The government candidly states in its brief that, "it appears that [Detective Garvey's] remark ["take some time to think about whether you want to answer, think about that question"] ..., although extremely brief and wholly without significant potential to overbear [Mr. Tindle's] will, nevertheless violated the *Edwards* rule because it was an effort to 'persuade' him to re-think his initial disinclination to speak with Detective Garvey without counsel present." We agree that the detective's remark violated *Edwards, supra.* In ruling that "[t]he defendant chose to answer" the questions of Detective Garvey, the trial court overlooked a fundamental holding of *Edwards* and its progeny: "[W]hen counsel is requested, interrogation must cease, and officials may not reinstate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick, supra,* 498 U.S. at 153, 111 S.Ct. 486. As the Supreme Court stated in *Edwards, supra:*

> Here, the officers conducting the interrogation on the evening of January 19 ceased interrogation when Edwards requested counsel as he had been advised he had the right to do. The Arizona Supreme Court was of the opinion that this was a sufficient invocation of his *Miranda* rights, and we are in accord. It is also clear that without making counsel available to Edwards, the police returned to him the next day. This was not at his suggestion or request.... We think it is clear that Edwards was subjected to custodial interrogation on January 20 ..., and that this occurred at the instance of the authorities. His statement, made without having had access to counsel, did not amount to a valid waiver and hence was inadmissible.

451 U.S. at 486–87, 101 S.Ct. 1880. Mr. Tindle's situation paralleled that of Ed-

wards. In accordance with his constitutional right, Mr. Tindle indicated that he did not want to make a statement without the presence of counsel. The next words came "at the instance of the authorities," *id.* at 487, 101 S.Ct. 1880, not Mr. Tindle: "[I]f you answer that no, I can't talk to you any more." "[T]ake some time to think about whether you want to answer, think about that question." Therefore, Mr. Tindle's subsequent statement was "made without having had access to counsel, . . . and hence was inadmissible." *Id.*[9] (footnote omitted).

■ Finally, we turn to a consideration of the constitutional harmless error issue, specifically, whether the trial court's error in not suppressing Mr. Tindle's audio-taped statement was harmless beyond a reasonable doubt. We hold that the error was not harmless beyond a reasonable doubt, since we cannot say on the record before us that there is no "'reasonable possibility that [Mr. Tindle's audio-taped statement] might have contributed to [his] conviction.'" *Smith, supra,* 529 A.2d at 317 (quoting *Chapman, supra,* 386 U.S. at 23, 87 S.Ct. 824). The other evidence presented by the government was not "overwhelming." *Id.* at 318. Both Ms. White and Mr. Redfield were subject to impeachment because of their use of cocaine prior to Mr. Thrower's stabbing. Equally significant, they depicted Mr. Thrower as an aggressive person who pushed and hit Mr. Tindle, and when separated from him, ran back towards Mr. Tindle. Moreover, if believed, Ms. Johnson's testimony that Mr. Thrower pushed Mr. Tindle, threatened to "bust" him, and had a gun, could have supported Mr. Tindle's self-defense theory. However, Mr. Tindle's audio-taped statement in which he not only asserted that he "stepped up and cut [Mr. Thrower and] took off running," but also that he did not know whether Mr. Thrower had "any weapons on him," undoubtedly carried great weight with reasonable jurors. Since the government had the burden to disprove Mr. Tindle's self-defense theory beyond a reasonable doubt, *see Comber v. United States,* 584 A.2d 26, 41 n. 17 (D.C. 1990) (en banc), without Mr. Tindle's audio-taped statement, there is a reasonable possibility that the government could not have sustained its burden. Consequently,

**9.** Mr. Tindle's case is not the same as at least three other cases in which we have addressed the *Edwards* issue. In *Morris v. United States,* 728 A.2d 1210 (D.C.1999), a divided panel concluded that discussions with the police "were resumed only after Morris himself requested that this occur." *Id.* at 1221. Morris asked a detective whether he could speak with a police sergeant, whom he named. The sergeant reminded Morris that he did not have to respond to questions without a lawyer. Morris responded, "Okay." When another detective was called into the room by the sergeant, Morris "began to talk," apparently without further words from the police officers. *Id.* at 1214. After the appellant in *Thomas v. United States,* 731 A.2d 415 (D.C. 1999) indicated that he did not want to talk to a police detective without a lawyer, and was told by the detective that the questioning had to stop, he made an incriminating statement. Unlike Mr. Tindle's case, the police detective did not instruct the appellant to "take some time to think about whether you want to answer, think about that question." In *Smith v. United States,* 529 A.2d 312 (D.C.1987), the appellant, who could "read very little," *id.* at 314, stated, in response to a question by the police officer, that he did not want to answer questions without the presence of a lawyer. He was asked follow-up questions designed only to clarify his reply to a prior question, that he wished to answer questions. The follow-up questioning confirmed that the appellant had been "confused" by the questions. *Id.* In contrast to the situation in *Smith,* the detective's declaratory words in Mr. Tindle's case were not designed to clarify his response to the questions concerning his *Miranda* rights, but, as the government candidly concedes, "to 'persuade' him to re-think his initial disinclination to speak with Detective Garvey without counsel present."

*Edwards, supra,* and its progeny, as well as *Chapman, supra,* compel the conclusion that the trial court's error in failing to suppress Mr. Tindle's audio-taped statement was not harmless beyond a reasonable doubt.

Accordingly, for the foregoing reasons, we reverse the judgment of the trial court.

*So ordered.*