**In re G.E., District of Columbia, Appellant.**

No. 04–FS–1596.

District of Columbia Court of Appeals.

Argued May 26, 2005.

Decided July 21, 2005.

Sidney R. Bixler, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, Edward E. Schwab, Deputy Attorney General, and Rosalyn Calbert Groce, Assistant Attorney General, were on the brief, for the appellant.

Sandra K. Levick, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and BLACKBURNE-RIGSBY, Associate Judge, Superior Court of the District of Columbia.*

BLACKBURNE-RIGSBY, Associate Judge, Superior Court of the District of Columbia:

At issue in this appeal is whether a police officer's question to G.E. "Are you sure?" after he was notified of and unequivocally invoked his Miranda[1] rights constituted further interrogation of G.E. while in police custody in violation of Miranda and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). On July 29, 2004, fourteen-year-old G.E. was arrested and taken into custody by the Metropolitan Police Department ("MPD")

after an eyewitness to a homicide that occurred on July 21, 2004, positively identified him. The trial judge granted G.E.'s motion to suppress his post-Miranda statements and found that G.E.'s constitutional rights were violated when the police officer initiated further interrogation after G.E. had invoked his Fifth Amendment right to counsel. The District of Columbia appeals the order granting the motion to suppress, arguing that instead it was G.E. who initiated conversation with the police officer in a separate exchange that immediately followed the police officer's question "Are you sure?" We reject this argument. Accordingly, we affirm and hold, under the circumstances of this case, that the police officer's question constituted unlawful interrogation of G.E. after he unequivocally invoked his Fifth Amendment right to counsel.

## I.

### A. Factual Background[2]

On the evening of July 21, 2004, a homicide was committed on the corner of Georgia Avenue and Quincy Street, N.W. On July 29, 2004, at approximately 9:30 p.m.,[3] while riding his bike with a friend, G.E., the fourteen-year-old appellee, was arrested, handcuffed and brought into the custody of the MPD for questioning.[4] Officer Philip Burggraf, the arresting officer, testified that he was riding in his car with Xavier Brown, whom he first saw on the

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The facts in this case are primarily derived from the transcript of the December 20, 2004 hearing on G.E.'s Motion to Suppress for which the trial judge's decision is the basis of this appeal.

3. There is conflicting testimony in the record with regard to the exact time of G.E.'s arrest. The arresting officer recalled that it was around 10:00 p.m. while the officer who questioned G.E. at the station recalled that appellee arrived at the station around 8:30 or 9:30 p.m.

4. The hearing transcript is unclear as to whether G.E. was read his Miranda rights at the time of his arrest.

sidewalk of Georgia and Quincy on the day of the homicide and later spoke to on July 28 and 29, 2004, regarding his recollection of the suspect. Mr. Brown is also a cousin of the decedent. Mr. Brown positively identified G.E. to Officer Burggraf when G.E. was arrested. Officer Burggraf testified at the hearing that G.E. was cooperative at the time of his arrest.

G.E. was transported to the Violent Crime Unit, Homicide Division of the MPD where he was introduced to Detective Anthony Paci, a detective assigned to the Violent Crime Unit. Detective Paci noted in his investigative report[5] that G.E. arrived at the Violent Crime Office at 11:00 p.m. Detective Paci testified that there he observed that G.E. was "kind of nervous because he didn't know what really was going on at first." Immediately upon entering the interrogation room, G.E. confessed that he had lied to the arresting officer about his age, stating that he was fourteen rather than seventeen as he stated originally.

After G.E. stated his correct age, Detective Paci handed him a Police Department Form 47 ("PD 47"), which is also referred to as a *Miranda* rights waiver card. The PD 47 form is entitled "WAIVER" and contains the following four questions:

1. Have you read or had read to you the warnings as to your rights?
2. Do you understand these rights?
3. Do you wish to answer any questions?
4. Are you willing to answer questions without having an attorney present?

G.E.'s PD 47 card was introduced as an exhibit at the hearing. Detective Paci had handwritten the date and time of July 29, 2004, 11:00 p.m. on the PD 47 form and signed it. The detective verbally gave G.E. his *Miranda* rights and then asked

him whether he could read or write, which G.E. answered in the affirmative. Then the detective asked him the four questions contained on the card.

Detective Paci's testimony regarding this portion of the interview forms the basis of this appeal and is transcribed below:

MR. ZIRPOLI (Government Counsel): Would you tell the Court what question one is please?

DETECTIVE PACI: (Reading from document) "Have you read or had read to you the warning as to your rights?" The answer is, "Yes," and he has his initials "G.E." behind that answer.

MR. ZIRPOLI (Government Counsel): What's question two?

DETECTIVE PACI: "Do you understand these rights?" "Yes." His initials are behind that.

MR. ZIRPOLI (Government Counsel): Question three?

DETECTIVE PACI: "Do you wish to answer any questions?" Answer is, "Yes." And then, it's his initials.

MR. ZIRPOLI (Government Counsel): Question four?

DETECTIVE PACI: "Are you willing to answer any questions without having an attorney present?" The answer is, "Yes." And then, he has his initials behind it.

MR. ZIRPOLI (Government Counsel): And there's also something that's crossed out in question four; is that correct?

DETECTIVE PACI: Yes.

MR. ZIRPOLI (Government Counsel): Would you explain that to the Court please?

5. Detective Paci testified that this is referred to as form PD 854.

DETECTIVE PACI: Yes. He had started to write "no" down there. He scribbled it out and said he wanted to talk; then, he wrote in "yes."

MR. ZIRPOLI (Government Counsel): *When he said—When he wrote in "no," what, if anything, did you say to him?*

DETECTIVE PACI: *I just said, I just asked him was he sure; and he said, "yes". And then, I said, "Well, I can't talk to you no more about this." That's when he said, "Well, I'm going to talk about it." I said, "Well, you wrote 'no' now; so I can't ask you any questions." He said he wanted to talk. He scribbled that out and wrote in "yes."* (Emphasis added.)

G.E. then proceeded to relay four different versions of what occurred on the night of July 21, 2004. First, G.E. explained he was at a barbershop in Mount Pleasant at the time of the shooting, but that he had heard about a shooting on Georgia and Quincy and that he did not know anything about it. Second, G.E. said that on the night of the murder he was returning on the metro from a nightclub called the D.C. Tunnel, and that when exiting the metro at the corner of Georgia and New Hampshire Avenues, he ran into an acquaintance known by the nickname "Mouse." G.E. told the detective that he knew Mouse from the neighborhood, and that Mouse was the one who did the shooting. When asked by Detective Paci to describe Mouse, G.E. said that he and Mouse looked alike. In his third story, G.E. said that he witnessed the shooting on his way from the D.C. Tunnel and that there was first a fistfight which led to the shooting. According to G.E., the fistfight was between Mouse and another man in front of the store at Georgia and Quincy and Mouse was beaten up.

Finally, G.E. explained that he and a friend were walking near Georgia Avenue and Randolph Street, Northwest, when two men named Derek and Mouse confronted them, and that Mouse brandished a handgun. G.E. said that Mouse showed him the handgun and told him that it was "get-back time," and the four of them then continued walking down Georgia Avenue. Detective Paci testified that G.E. testified that Mouse wanted revenge because he was beaten up earlier in the evening, and that this was the fistfight described by G.E. in version three of his story. G.E. then stated that Mouse opened fire on the crowd of people congregated on the corner of Georgia Avenue and Quincy Street, and that when Mouse did so G.E. ran to Raymond Elementary School, which was located just blocks from the site of the shooting.

G.E. did not confess to the murder during this colloquy, but Detective Paci found that his statements were sufficiently incriminating to provide probable cause to arrest G.E. On July 30, 2004, at his Initial Hearing, G.E. was ordered detained at Oak Hill for a five-day hold pending the filing of a petition. On August 9, 2004, the District of Columbia filed a petition charging G.E. with conspiracy to commit murder while armed with a firearm in violation of D.C.Code § 22–1805(a), § 22–2101 and § 22–4502 (2001); knowingly and intentionally possessing a firearm while committing a crime of violence in violation of D.C.Code § 22–4502; discharging a firearm in violation of 24 D.C.M.R. § 2300.1 (2001); and possession of ammunition without being the holder of a valid registration certificate for a firearm, in violation of D.C.Code § 7–2506.01 (2001).

At the suppression hearing, Detective Paci was asked by government counsel what, if anything he did to "force" G.E. to talk to him. The detective's testimony is as follows:

DETECTIVE PACI: I didn't do anything.

MR. ZIRPOLI (Government Counsel): How did you threaten him?

DETECTIVE PACI: I didn't threaten him at all.

MR. ZIRPOLI (Government Counsel): What coercion did you use to get him to tell you these stories?

DETECTIVE PACI: I didn't do anything.

MR. ZIRPOLI (Government Counsel): At the conclusion of the interview, what, if anything happened next?

DETECTIVE PACI: At that time, Detective Griffin had c[o]me in; and they started talking. So I started preparing the paperwork on the case. And at one point, I believe Detective Griffin allowed him to call his mother.

The length of G.E.'s detention and questioning is not clear from the transcript or record before us. Detective Paci testified that he believed that the entire conversation lasted approximately one hour, but later referred to G.E.'s "spontaneous story telling" as lasting "the whole night." It is undisputed that G.E. arrived at Detective Paci's office at approximately 11:00 p.m. and that the detective's official 854 report of G.E.'s statements indicates that it was last updated on July 30, 2004, at 3:51 a.m. Detective Paci testified that the time on his report is the time when he concluded preparing the report and not the time at which the interview concluded. The interview was neither videotaped nor tape-recorded, despite Detective Paci's testimony that the room G.E. was interviewed in had technology suited for and available for both procedures.

### B. Trial Judge's Ruling

G.E. filed a *motion to* suppress his statements based on violations of his Fourth and Fifth Amendment and *Miranda*

rights. At the suppression hearing on December 20, 2004, the trial judge made several key factual findings, which formed the basis for his decision to suppress the statements made by G.E. to Detective Paci on the night of July 29, 2004.

The judge declared, "It's quite clear that once a respondent asserts the right to counsel, all questioning has to stop." The judge therefore found that Detective Paci's question "Are you sure?" after G.E. answered "No" to question number four on his PD 47 card violated G.E.'s *Miranda* rights. The judge further stated that, although "Police are allowed to ask narrow questions to clarify the accused's statement when there is equivocal or ambiguous information," G.E.'s answer "No" to question four was an unambiguous statement and that therefore Detective Paci "initiated" the conversation that led to G.E.'s narrative, thereby violating the rule established in *Edwards, supra:*

> THE COURT: ... In this case, the answer was "no." That's quite clear. It's quite unequivocal. And there were no events leading up to the answer "no" that would have created in the detective's mind any confusion regarding what "no" meant.... The initiative came from Detective Paci: "Are you sure?".... Mr. E did not initiate. It was Detective Paci. Hence, the suppression of the statement.

The judge concluded that although G.E.'s statements must be suppressed they were not "obtained in violation of the Fourth Amendment," or involuntarily in the traditional sense. Hence, the judge stated that the suppressed statements may be used for purposes of impeachment at trial should G.E. elect to testify.

The trial judge credited the testimony of Officer Burggraf and Detective Paci regarding the events that occurred when

G.E. was arrested and questioned on the night of July 29, 2004. The trial judge further found that Officer Burggraf had probable cause to arrest G.E. based on the positive identification of him by Xavier Brown.[6] Citing D.C.Code § 23–581(a)(1)(a)(2001), the trial judge held that the arresting officer had the authority to arrest G.E. without a warrant because he had adequate probable cause to believe that G.E. committed a felony.

## II.

The District argues that the trial judge erred in granting G.E.'s motion to suppress because: (1) Detective Paci's statement after G.E. answered "no" to the question of whether he was willing to answer questions without counsel, did not constitute interrogation; and (2) the "sequence of events" constitutes an initiation of a conversation about the crime by G.E., rather than by the police.

In contrast, G.E. contends that initiation under the *Edwards* doctrine is a question of fact and that the trial judge's dual findings: (a) that G.E. unambiguously answered "no" to question four on the PD 47 form and (b) that the detective's subsequent question "Are you sure?" was an initiation within the meaning of *Edwards*, are not clearly erroneous.

 On appeal of a trial court's grant of a motion to suppress, "we must accept the trial judge's findings of evidentiary fact and his resolution of conflicting testimony." *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991). However, the trial judge's "legal conclusions regarding whether the defendant was in custody and whether the facts, as found by the trial judge, establish an *Edwards* violation" are reviewed *de novo. Morris v. United*

*States,* 728 A.2d 1210, 1215 (D.C.1999) (citing *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Reid v. United States,* 581 A.2d 359, 363 (D.C.1990)). In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court held that the term "'interrogation' under *Miranda* refers not only to express questions, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." Whether actions by police constitute 'interrogation' is a question which we review *de novo. Stewart v. United States,* 668 A.2d 857, 863 (D.C.1995). The issue before us is whether G.E. was unlawfully interrogated after invoking his right to counsel. Since this is an issue of law, we review *de novo.* While in some cases involving purported *Miranda/Edwards* violations, a review of the trial court's underlying factual findings is necessary (since those findings form the basis of the trial court's legal conclusions), there is no dispute in this case as to the key underlying facts regarding what was said by the police officer and G.E., or as to the sequence of the statements.

## III.

In *Miranda,* the Supreme Court held that if an accused while in custody, invokes his right to counsel, all questioning must cease until an attorney is made available and is present. *Morris,* 728 A.2d at 1217 (citing *Miranda,* 384 U.S. at 474, 86 S.Ct. 1602). *Edwards* and its progeny expand on the rights afforded in *Miranda* and dictate that "police questioning of a suspect who has invoked the right to counsel is prohibited unless the accused himself initiates further communication, ex-

---

**6.** Mr. Brown did not testify at the suppression hearing. Officer Burggraf testified that he had no contact with Mr. Brown subsequent to July 29, 2004.

changes, or conversations with the police." *Id.* (internal citations and quotations omitted). In essence, *Edwards* added a second layer of protection for the *Miranda* right to counsel. Under *Edwards,* "not only must the current interrogation cease, but [the accused] *may not be approached for further interrogation* 'until counsel has been made available to him.'" *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis added) (citing *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880). To further stress the importance of the *Miranda* and *Edwards* principle, the Supreme Court has held "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present whether or not the accused has consulted with his attorney." *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

▇ The trial judge found, based on the testimony, that after invoking his right to counsel G.E. "did not initiate" further conversation with the police but rather "the initiative came from Detective Paci [when he asked]: 'Are you sure?'" The issue before us is whether the trial judge correctly concluded that Detective Paci unlawfully continued interrogation after G.E. invoked his right to counsel.

The trial judge made the legal determination that G.E.'s *Miranda/Edwards* rights were violated because, once G.E. had answered "no" to question four, *all* questioning and conversation on the part of Detective Paci should have ceased. The judge correctly held that the detective's further statement "Are you sure?" (especially when coupled with "Well, then I can't talk to you no more"), violated the rule established in *Edwards.* Although the trial judge did *not* specifically cite to *Edwards* or the cases that followed it, he correctly stated the law, which makes it

clear that when counsel is unequivocally requested, all questioning must cease. *See Miranda; Edwards,* and *Minnick, supra.*

We reject the District's argument that G.E., and not Detective Paci, initiated the conversation that followed G.E.'s initial negative response to question four on the PD 47 form. The District concedes that it was Detective Paci who uttered the first words "Are you sure?" after G.E.'s initial invocation of his right to counsel. Similarly, we reject the District's position that the police officer's question was merely for clarification purposes. The trial judge correctly found that there was no ambiguity or equivocation in G.E.'s initial response to question four on the PD 47 waiver. While the *Edwards* rule is considered to be a rigid one, ensuring protection of Fifth Amendment rights, the Supreme Court has noted that "there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue." *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). There is no support in the record for the District's argument that the detective's question was merely to clarify G.E.'s intent. As we held in *Smith v. United States,* 529 A.2d 312 (D.C.1987), there were no surrounding facts or circumstances that called G.E.'s "no" response into question. Indeed, when Detective Paci asked G.E. if he was sure of his response, G.E. reiterated that he did not wish to answer questions without his attorney present. Notably, the detective did not ask G.E., "Are you sure?" after G.E. responded to any of the other questions on the PD 47 form.

G.E.'s situation is analogous to that of the accused in the cases of *Smith* and *Tindle v. United States,* 778 A.2d 1077 (D.C.2001). In each of those cases the accused unequivocally indicated that he did not want to make a statement or answer

questions without counsel. In *Tindle* the defendant answered "no" on a waiver form question that inquired of him whether he wanted to make a statement without counsel present. *Id.* at 1080. The detective asked Mr. Tindle if he "was sure" and if he wanted to "re-think his answer," at which point Mr. Tindle changed his answer to "yes" and the interrogation continued. *Id.* We reversed the judgment of the trial court and held that Tindle had "clearly invoked" his right to counsel by answering "no" to the question. *Id.*

Similarly, *Smith* involved a situation where Mr. Smith, while in police custody, filled out his PD 47 form in the affirmative for questions one through three and then answered "no" to question four pertaining to whether he wished to answer questions without counsel. *Smith*, 529 A.2d at 314. The police officer then asked Mr. Smith "are you willing to answer any questions without having a lawyer present; and are you saying you don't want to answer any questions?" Mr. Smith responded, "Yes, I want to answer questions." *Id.* at 314. We held that Mr. Smith had invoked his right to counsel by answering "no" to question four on his PD 47 form and that the "police violated Smith's *Miranda* rights by continuing to interrogate him after he invoked his right to counsel." *Id.* at 317.

In contrast, there are cases where we have concluded that the accused initiated conversation after invoking the right to counsel. For example, compare *Tindle* and *Smith* to the facts in *Thomas v. United States*, 731 A.2d 415 (D.C.1999), and *Morris v. United States*, 728 A.2d 1210, 1215 (D.C.1999). In *Thomas* we reversed a determination by the trial judge that Thomas unambiguously invoked his right to counsel by answering "no" to question four on the PD 47 form after answering "yes" to the first three questions. In that case, the detectives had told Thomas that they could no longer talk to him because he answered "no" to question four, and the defendant then on his own accord scratched out his "no" answer and wrote "yes" and indicated that he wanted to talk. Thomas indicated that he "really" wanted to talk. *Thomas*, 731 A.2d at 419. We held that the detective did not further interrogate Thomas, in that the detective did not ask Thomas a question or further interrogate him, but rather "simply stated the reality." *Id.* at 427.

In the *Morris* case, we held that the defendant initiated further discussion of the case and that he knowingly and intelligently waived his right to counsel pursuant to the standards set forth in *Edwards*. While in police custody for questioning, Mr. Morris made several statements about the circumstances leading to the injuries and subsequent death of a three-year-old girl. Upon being advised of his *Miranda* rights, Mr. Morris indicated that he did not want to answer any questions without a lawyer present. *Id.* Mr. Morris then asked if he could talk with a police sergeant, who "'guessed' that Morris was 'kind of lonely or something' and wanted some company." *Morris*, 728 A.2d at 1214 n. 8. The sergeant reiterated to Morris that he should not discuss the case at all since an attorney was not present, and Morris began to talk about other things such as his family background. *Id.* at 1214. Then, in the course of his dialogue he said, "I might as well tell you what happened to Rhonda." *Id.* Mr. Morris was then re-read his *Miranda* rights and signed a new form PD 47 waiving those rights. *Id.*

■ In the instant case, Detective Paci's question "Are you sure?" constitutes interrogation. "'[I]nterrogation' under *Miranda* refers not only to express questions, but also to any words or actions on the

part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis, supra.* This question was improper after G.E. had unequivocally answered "no" to the question whether he was willing to answer any questions without counsel present. As discussed, *supra,* there are no facts or circumstances in this case, which suggest anything uncertain or equivocal in G.E.'s response. As the government conceded, and as this court held in *Tindle,* the question "Are you sure?" like the question at issue in *Tindle,*[7] "although extremely brief ... [clearly was] an effort to 'persuade' [G.E.] to rethink his initial disinclination to speak with [police] without counsel present." This type of questioning is what *Miranda; Edwards* and *Minnick* seek to guard against. This rule is designed to protect the accused from "badgering or overreaching—explicit or *subtle,* deliberate or unintentional [that] might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (emphasis added) (internal citations omitted) (citing *Oregon v. Bradshaw,* 462 U.S. at 1044, 103 S.Ct. 2830; *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

 Under certain circumstances statements made by a defendant, after he has invoked his right to counsel, may be admissible if there was a break in custody

subsequent to invocation of the right to counsel. *McNeil v. Wisconsin,* 501 U.S. at 177, 111 S.Ct. 2204. If, however, the police "initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are *presumed* involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *Id.* at 177, 111 S.Ct. 2204. The District points to no break in custody such that G.E. can be said to have made his incriminating statements after a second, independent interrogation; and thus his statements must be deemed involuntary and inadmissible for use as substantive evidence. The facts here negate a finding that there was a break in the interrogation. Detective Paci testified that when G.E. invoked his right to counsel he immediately asked him "Are you sure?" and then stated, "Well then I can't talk to you no more." G.E. then said, "Well, I want to talk," and began talking. The entire exchange was completed within seconds. The *Edwards* violation occurred at the moment the detective asked G.E. if he was sure that he did not want to answer questions without counsel present. There was no act on the part of G.E. or the detective to suggest a break in custody or interrogation nor was G.E. re-*Mirandized* as the suspect was in the *Morris* case. The trial judge had ample basis for his finding that the inculpatory statements were the product of the *Edwards* violation.[8] The detective's statement "Well

---

7. In *Tindle* the detective asked the accused "If you answer that no, I can't talk to you any more." The detective then added, "Take some time to think about whether you want to answer, think about that question."

8. The trial judge correctly ruled that G.E.'s statements may be used for purposes of impeachment at trial if G.E. should decide to testify on his own behalf. *See Michigan v.*

*Harvey,* 494 U.S. 344, 350–51, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (internal citations omitted). It is well settled that "if a defendant exercises his right to testify on his own behalf, he assumes a reciprocal 'obligation to speak truthfully and accurately.'" *Harvey, supra,* at 351, 110 S.Ct. 1176 (citations omitted).

then I can't talk to you no more," following his question to G.E., was not sufficient in this context to constitute a break in custody that would justify deeming this brief exchange as two separate conversations.

For the foregoing reasons the judgment of the trial court is

*Affirmed.*