Ramone S. JENNINGS, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–736.

District of Columbia Court of Appeals.

Argued Dec. 3, 2009.

Decided Feb. 25, 2010.

Thomas D. Engle, appointed by this court, with whom Sharon L. Burka was on the brief, for appellant.

Suzanne G. Curt, Assistant United States Attorney, with whom Roy W. McLeese III and Gary M. Wheeler, Assistant United States Attorneys, and Jeffrey A. Taylor, United States Attorney at the time the brief was filed, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

Following a jury trial, appellant was convicted of armed robbery, felony murder, and second-degree murder arising from his alleged involvement in the armed robbery of Antoine "Fat Tony" Womack. On appeal, appellant argues that his convictions should be vacated for three reasons. First, appellant claims that the trial court erred in refusing to suppress his confession. Second, appellant argues that the trial court gave an improper jury instruction regarding his charge for second-degree murder. Finally, appellant contends that his due process rights were violated because the trial judge assumed a prosecutorial role. For the reasons explained more fully below, we affirm.

## I.

The government's main witness at trial, Bernard Anderson, testified that he called his cocaine supplier, Fat Tony, on the night of the murder to make arrangements to purchase some cocaine. According to Bernard, appellant then hatched a plan to rob Fat Tony, and suggested that Bernard call Fat Tony back and increase his order to maximize their potential takings. Bernard complied, and as they waited for Fat

Tony to arrive, appellant displayed a pistol in his waistband. When Fat Tony pulled up, Bernard got into the passenger seat, as planned, and appellant got in the back. Fat Tony drove about three blocks to 7th and Nicholson Streets, where he parked his car. Appellant then put his gun against the back of Fat Tony's head.

Fat Tony said "Y'all don't have to do this" and gave his money and drugs to Bernard, who then exited the car. After Bernard had taken a few steps back towards his house, he looked back, saw a flash, and heard a gunshot. Appellant then exited from the driver's side back door and the two men split up after agreeing to meet later at Bernard's house. When Bernard saw appellant 45 minutes later, he gave him about $450 and some of the cocaine. Bernard asked appellant what he had done and appellant replied that he shot Fat Tony because he did not want to see him around the neighborhood anymore. Bernard saw appellant about a week later and gave him more of the drugs and $100.

Police responded to the scene of the shooting, took photographs, and recovered one cartridge casing from inside Fat Tony's car. A Deputy Medical Examiner determined that Fat Tony died from a single gunshot wound to the back of his head. The bullet entered his brain at the right side of the back of his head and there were stippling marks near the wound, which indicated that the murder weapon was fired from no more than 18 inches away.

Appellant was arrested about six months later pursuant to a warrant charging him with the murder of Fat Tony. After being transported to the Metropolitan Police Department's violent crime office, Detective Milton Norris placed appellant in an interview room and left him alone for about 20 minutes. When Detective Norris returned, he told appellant that he was under arrest for homicide and read appellant the *Miranda*[1] warnings from a PD–47 rights card. Appellant executed the PD–47 rights card and indicated that he wanted to talk to the police. Before Detective Norris left the interview room, he told appellant that another detective would be there soon to speak with him. Detective Wayne Corbett, who was one of the detectives assigned to the Fat Tony homicide, came in the interview room about 30 minutes later.

Detective Corbett's interview of appellant was filmed on videotape, and the government introduced the tape into evidence at trial.[2] At first, appellant claimed that he was not involved in the murder of Fat Tony and that he did not find out about it until "a couple days later." He said that he was outside Bernard Anderson's house on the day of the murder and that he saw Bernard and his younger brother Harold get into Fat Tony's car. When the Andersons returned about 15–25 minutes later in a different car, appellant went with Harold to a store where Harold bought some clothing for himself and for appellant.

After Detective Corbett had been alone with appellant in the interview room for some time discussing the Fat Tony murder, Detective Norris came back in because he wanted to ask appellant about a double homicide that occurred near where Fat Tony was murdered. Appellant denied having any knowledge about these other murders and he became upset with Detective Norris when Detective Norris accused him of threatening a witness. Ap-

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. It appears that at least a good portion of the tape was played for the jury (although the record does not indicate exactly which parts).

pellant asked Detective Corbett, who was still in the interview room as well, "Can I talk to you? Because he [Detective Norris] acting like he got a problem." Appellant also complained to Detective Corbett that "he [Detective Norris] not listening to me." As Detective Norris continued questioning appellant about the threat, however, appellant became more agitated and the following exchange took place:

> **Appellant** [to Detective Norris]: I'm done talking to you. Go get my lawyer. How about that? You just made it that simple for me. Go get my lawyer. I'm done talking to you. [to Detective Corbett]: Can I talk to you, please?
>
> **Detective Norris:** Okay. Oh, you the one charged with murder one, not me.
>
> **Appellant** [to Detective Corbett]: Can I talk to you please?
>
> **Detective Corbett:** Um-hum.
>
> **Appellant** [to Detective Corbett]: Now he just getting ignorant, you know what I'm saying? You can't—[to Detective Norris] I'm trying to help you out and you are going to get ignorant with me.
>
> **Detective Norris:** You know, when, when—
>
> **Detective Corbett:** Just listen to him for a minute.
>
> **Detective Norris:** You know—
>
> **Appellant** [to Detective Corbett]: Okay. But he won't listen to me.
>
> **Detective Norris:** No, no, no. It seems to me—no, I'm going to go ahead and leave because you asked for a lawyer. But I'm going to tell you something—let me tell you something. Don't get defensive when I'm trying to ask you questions and (indiscernible).
>
> **Appellant** [to Detective Norris]: I wasn't getting defensive.

Appellant and Detective Norris then engaged in a back-and-forth debate about whether appellant was being defensive in his responses to Detective Norris, which culminated in the following exchange:

> **Appellant** [to Detective Norris]: All right, then. Damn, man. You people crazy. I'm just going—you think I know something, huh?
>
> **Detective Norris:** No. That's not what I tried to do. I'm trying to get you to tell the truth.
>
> **Appellant** [to Detective Corbett]: Can I talk to you?
>
> **Detective Corbett:** Yeah. [Detective Norris leaves the room]

Thereafter, Detective Corbett and appellant continued talking for approximately another 40 minutes, during which appellant stuck with his initial version of events, *i.e.*, that he was not involved in the murder of Fat Tony. At that point, Detective Corbett got appellant some water and took him to the restroom.

After appellant returned from the restroom, he was left alone in the interview room for approximately 25 minutes. When another officer came in and told appellant that he would soon be transported to the central cell block, appellant asked to speak again with Detective Corbett. When Detective Corbett came back in, appellant asked how he could get arrested for murder. Detective Corbett noted that people had seen appellant getting out of Fat Tony's car, to which appellant responded that "none of that [expletive] make no sense." Detective Corbett suggested that perhaps appellant had been in Fat Tony's car but someone else did the shooting. Appellant continued his denials and complained: "man, you all try to get me to eat the cheese on this one."

Detective Corbett said that he only wanted appellant to tell the truth and that appellant was facing a sentence of up to 50 years. When appellant said: "If I tell you all what really did happen ...", Detective Corbett replied that he already knew what really happened and said that they could work something out if appellant told the

truth. Appellant then began speculating that he might be facing at least five to fifteen years even with a deal and Detective Corbett replied that five was better than fifty. Soon thereafter, appellant admitted that he had been in Fat Tony's car at the time of the murder but he claimed that he had not done the shooting. In this second version, appellant said that he got in Fat Tony's car with his friend Harold and Harold's older brother, Bernard.

According to appellant, Harold had planned to rob Fat Tony at his house. But when Harold pointed his gun at Fat Tony and told him that he wanted to go to Fat Tony's house, Fat Tony refused. Bernard took Fat Tony's money out of his pockets while appellant held the drugs, and as soon as Bernard opened the car door to leave, Harold shot Fat Tony in the head. Appellant exited Fat Tony's car, ran down an alley, and threw the drugs in a car behind Harold's house. Harold later gave appellant money and drugs, and told him to keep his mouth shut.

Appellant filed a motion to suppress all of the statements that he made after he requested a lawyer, claiming—among other arguments that he does not repeat on appeal—that his statement to Detective Norris was an unequivocal invocation of his *Miranda* rights which should have precluded all further questioning from either detective. In response, the government emphasized that appellant asked Detective Corbett "Can I talk to you, please?" immediately after he asked Detective Norris to "Go get my lawyer." The government also noted that there were other objective indications that appellant wished to continue the discussion (at least with Detective Corbett), including his comment that he was trying to "help out" but Detective Norris was acting ignorantly.

In denying appellant's motion, the trial judge expressly credited the detectives' testimony and noted that he had viewed the entire videotape of appellant's interview. In his opinion, the exchange between Detective Norris and appellant that preceded appellant's request for his lawyer appeared to stem from Detective Norris not understanding some of appellant's questions or answers. The court rejected appellant's claim that his statement was an unequivocal invocation of his *Miranda* rights as to both detectives; instead, the court found that the statement was sarcastic and that appellant would even have been willing to talk further with Detective Norris if he had tried to understand what appellant was trying to say.

The court further noted that Detective Norris acted cautiously when he said that he would not speak with appellant further because appellant had requested a lawyer. And even though the trial court denied appellant's motion based upon its determination that his request for a lawyer was sarcastic, the trial judge's ruling includes an express finding—which is also clear on the videotape—that appellant had "turned and moved" toward Detective Corbett and asked to speak with him immediately after his request that Detective Norris "Go get [his] lawyer."

## II.

### A. Appellant's Motion to Suppress

■ In reviewing a denial of a motion to suppress, we must view the record in the light most favorable to the prevailing party, and uphold the trial court's findings of fact and all inferences derived therefrom unless they are clearly erroneous. *Robinson v. United States,* 928 A.2d 717, 725 (D.C.2007). We review the trial court's legal conclusions, however, *de novo. Id.*

Appellant argues that the trial court erred in denying his motion to suppress. His first argument is that the trial court erroneously concluded that appellant never

invoked his *Miranda* rights. Instead of forcefully defending the trial court's finding that appellant's request for a lawyer was "sarcastic" and thus not a valid invocation, however, the government's response on this point is conspicuously relegated to a footnote. Instead, the government argues that appellant invoked his *Miranda* rights, if at all, with regard to Detective Norris only. Alternatively, the government argues that even if appellant invoked his *Miranda* rights as to both detectives, he waived his right to counsel by immediately reinitiating the conversation (when he asked Detective Corbett "Can I talk to you, please?"). In response, appellant notes that the trial court never reached the government's *Edwards*[3] theory because it found that appellant never invoked his *Miranda* rights. Appellant insists that if we reach an *Edwards* analysis, he prevails nonetheless because he did not reinitiate the conversation after invoking his *Miranda* rights.

 In sum, for the reasons explained more fully below, we agree with appellant that the trial court erred in concluding that he never invoked his *Miranda* rights because his statements were "sarcastic." Although the trial court is normally afforded great deference to make credibility determinations and factual findings, we conclude that the trial judge erred as a matter of law when he held that appellant failed to invoke his *Miranda* rights in this case. Ultimately, however, we affirm the trial court's denial of appellant's motion to suppress because we find that appellant immediately reinitiated the discussion with the detectives and thereby waived his right to counsel.

 We begin our analysis by noting that the Supreme Court established a "bright-line rule" in *Miranda*[4] that if an accused who is subject to custodial interrogation invokes his or her right to counsel, "the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. 1602. The Court elaborated in *Edwards* that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Edwards, supra,* 451 U.S. at 484, 101 S.Ct. 1880 (emphasis added); *see In re G.E.,* 879 A.2d 672, 678 (D.C.2005). The first question, then, is whether appellant in fact invoked his right to counsel, and the Supreme Court has counseled that the test is an objective one: "Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States,* 512 U.S. 452, 460, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (citation omitted).

 In this case, appellant said "I'm done talking to you. Go get my lawyer." The trial court denied appellant's motion to suppress, however, reasoning that appellant was being sarcastic. Having reviewed the videotape, which was part of the record, we can see why the trial judge may have thought appellant's statement was sarcastic. *Cf. Smith v. United States,* 529 A.2d 312, 317 (1987) (acknowledging

**3.** *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**4.** *Miranda, supra,* 384 U.S. at 544, 86 S.Ct. 1602 (White, J., dissenting); *see also Oregon*

*v. Elstad,* 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("The Court today in no way retreats from the bright-line rule of *Miranda.*").

that "it is conceivable that an individual might say the word 'no' with a look or a tone of voice communicating some ambiguity or confusion"). Nevertheless, when we apply the objective test enunciated in *Davis*, we conclude that appellant was "sufficiently clear[ ] that a reasonable police officer" would have understood his statement as a request for an attorney. 512 U.S. at 460, 114 S.Ct. 2350.

■■ Having found that appellant invoked his right to counsel, we must next consider whether *Edwards* requires the suppression of his subsequent confession. As noted above, when an individual who is subject to custodial interrogation requests an attorney, the interrogation must cease "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards, supra,* 451 U.S. at 484, 101 S.Ct. 1880. In this case, we have no doubt that appellant reinitiated the conversation. Indeed, without pausing so much as to even take a breath in between, appellant turned to face Detective Corbett and asked "Can I talk to you, please?" immediately after he told Detective Norris to "Go get my lawyer." In this regard, appellant's reliance on *In re G.E.* is misplaced.

In *In re G.E.,* we affirmed the trial court's determination that it was the police, and not the defendant, who initiated the conversation where the detective asked "Are you sure?" after G.E. invoked his right to counsel. *In re G.E., supra,* 879 A.2d at 678. Appellant asks us to focus on Detective Norris' statement ("Okay. Oh, you the one charged with murder one, not

me.") and claims that it—like the "Are you sure?" in *In re G.E.*—was an "effort to persuade [appellant] to rethink his initial disinclination to speak with [police] without counsel present." *Id.* at 680. But appellant ignores the fact that he had already turned to Detective Corbett and asked "Can I talk to you, please?" even before Detective Norris made the statement at issue. Thus, however inadvisable it may have been, we cannot say that Detective Norris' comment was an "effort to persuade [appellant] to rethink his initial disinclination to speak with [police] without counsel present," *id.,* because appellant had already "evinced a willingness and a desire for a generalized discussion about the investigation"[5] when he turned toward Detective Corbett and asked "Can I talk to you, please?"[6]

■■ As we reiterated in *Morris v. United States,* 728 A.2d 1210, 1217 (1999), however, *Edwards* requires more than just a simple inquiry into who reinitiated the conversation. "[I]f an accused does initiate communication with the authorities after he has refused to answer questions without counsel, the police nevertheless may not interrogate him without an attorney being present unless he has knowingly and intelligently waived his right to counsel." *Id.* As we have held, the determination whether there has been an intelligent waiver of the right to counsel must depend upon the particular facts and circumstances in each case, including the background, experience, and conduct of the accused. *Morris,* 728 A.2d at 1219. In this case, appellant has not challenged the

---

**5.** *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

**6.** Incidentally, we note as well that Detective Norris' comment did not illicit an incriminating response from appellant. Again, while we do not condone Detective Norris' comment, we conclude—indeed, the videotape

makes clear—that it was appellant, and not Detective Norris, who reinitiated the conversation. As such, we need not reach the government's alternative argument that *In re G.E.* is distinguishable because Detective Norris' comment ("Okay. Oh, you the one charged with murder one, not me") was not phrased as a question.

trial court's finding that he voluntarily waived his *Miranda* rights when he initially agreed to speak with the police. Nor is there anything in the record to suggest that appellant did not still understand those rights when he later reinitiated contact with Detective Norris. *See Morris*, 728 A.2d at 1219–20 (trial court's conclusion that defendant's waiver was knowing and voluntary supported by evidence that defendant invoked his right to counsel just before reinitiating the discussion). Furthermore, as the trial court noted, appellant had previous experience with the criminal justice system.

In fact, this case reminds us of the circumstances we faced in *McIntyre v. United States*, 634 A.2d 940 (D.C.1993). In that case, we affirmed the trial court's finding that Mr. McIntyre had reinitiated the conversation with police. *Id.* at 944. Like appellant in this case, McIntyre was no stranger to the criminal justice system, and in that case we found that he had knowingly and intelligently waived his right to counsel because he negotiated with the police and ultimately agreed to continue speaking with them on the condition that he have an opportunity to visit with his girlfriend. *Id.* at 945 ("appellant's shrewd conduct in negotiating with [the police] showed his knowledge of his rights and his clear concise understanding of them ... they were bargaining as equals"). In this case, we find that appellant demonstrated a similar shrewdness when he told Detective Norris to "Go get my lawyer" before immediately turning to

Detective Corbett and asking "Can I talk to you, please?"[7] Indeed, after having invoked his rights in a strategic manner to manipulate the situation and exclude Detective Norris from the interview room, appellant cannot argue that he did not knowingly and intelligently waive those rights when he reinitiated the discussion with Detective Corbett immediately thereafter.

### B. Appellant's Other Challenges

 Appellant's other two contentions merit only brief discussion. First, appellant contends that the trial court gave an erroneous jury instruction regarding the requisite intent for aiding and abetting second-degree murder. *See Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (*en banc*). Even assuming error, however, it would be harmless because appellant's conviction for second-degree murder merges with his conviction for felony murder.[8]

 Appellant's other argument is that he "was denied due process" because the trial judge "assumed a prosecutorial role." Specifically, appellant claims that the trial judge asked him questions "in such a way to telegraph [his] skepticism of appellant's testimony." Appellant also complains about the five or six instances where the trial judge said the word "sustained" even before the government raised an objection. Appellant concedes that the plain-error standard of review applies because his trial counsel failed to object be-

7. Even before this exchange took place, appellant had expressed his frustration with Detective Norris and indicated his preference to speak with Detective Corbett instead. By asking Detective Norris to "get my lawyer" and then immediately reinitiating the conversation with Detective Corbett, appellant effectively got what he wanted—Detective Norris left the interview room and appellant had an opportunity to continue his conversation with De-

tective Corbett. In doing so, however, appellant also demonstrated "his knowledge of his rights and his clear concise understanding of them." *McIntyre, supra*, 634 A.2d at 945.

8. As appellant notes, his conviction for the underlying robbery also merges with the conviction for felony murder. *See, e.g., Page v. United States*, 715 A.2d 890, 894 n. 6 (D.C. 1998).

low. Under the plain-error standard, "[t]here must be an 'error' that is 'plain,' and that 'affect[s] substantial rights.'" *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Even then, we may not exercise our discretion to correct a forfeited error unless it "'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (citations omitted).

 We have stated before that the trial court "must not take on the role of a partisan .... Prosecution and judgment are two separate functions in the administration of justice; they must not merge." *Johnson v. United States,* 613 A.2d 888, 895 (D.C.1992) (internal quotation marks and citation omitted). We have also said, though, that a trial judge may properly ask questions of a witness, including the defendant, "when he deems that the end of justice may be served thereby." *Greenhow v. United States,* 490 A.2d 1130, 1135 (D.C.1985) (quoting *Griffin v. United States,* 83 U.S.App. D.C. 20, 21, 164 F.2d 903, 904 (1947)). On this record, we cannot say that the trial court's questions or its anticipatory "sustained" rulings—even when considered collectively-meet the high standard of plain—error review. Indeed, even assuming they were error, appellant has not and cannot demonstrate that these errors "affect substantial rights," much less that they "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings."

First, regarding the trial court's questioning of defendant, we note that we rejected a similar plain-error challenge in *Greenhow.* In that case, the court had questioned the defendant *sua sponte* about whether he was employed at the time of his arrest. 490 A.2d at 1135. The court then called a bench conference to alert the prosecutor that the defendant had previously given an inconsistent response to the court's intake personnel. Armed with the court's intake paperwork, the prosecutor then impeached the defendant in front of the jury. *Id.* at 1136. Even though the defendant's credibility and his employment status were key to his defense, we held that Mr. Greenhow's substantial rights were not affected because, *inter alia,* he had an opportunity, in responding to the court's question, to "make a logical answer explaining his conduct ... consistent with his [defense] theory." *Id.* (quoting *Griffin,* 83 U.S.App. D.C. at 21, 164 F.2d at 904); *see also United States v. Spencer,* 306 U.S.App. D.C. 399, 404, 25 F.3d 1105, 1110 (1994) (defendant not prejudiced by trial court's questioning of his alibi witness, even though questions arguably connoted the court's disbelief, because witness' response could have assisted the defense theory); *Griffin,* 83 U.S.App. D.C. at 21, 164 F.2d at 904 (defendant not prejudiced by court's questioning of him where his responses supported his self-defense theory).

 In this case, the court questioned appellant about his inconsistent explanations for why he confessed to a crime that he did not commit.[9] Like the situations in *Greenhow, Spencer,* and *Griffin,* we find that appellant was not prejudiced by the trial court's questioning because, *inter alia,* his responses could have helped his defense. Had the jury believed him, appellant's responses might have explained why he gave a false confession. Furthermore, that appellant's trial counsel appar-

---

9. During cross examination alone, appellant gave at least two different explanations. At one point, he claimed that he was only repeating what Detective Corbett told him to say because he wanted to avoid a fifty-year sentence. Only minutes before, however, appellant had testified that he confessed because he was uncomfortable in the "heated" interview room and he was just "trying to get out of there."

ently perceived the court's questioning as innocuous enough not to object or even pose any follow-up questions is just another indication of a lack of prejudice. *See Golsun v. United States*, 592 A.2d 1054, 1060 (D.C.1991).[10]

 We are similarly unpersuaded that the trial court's preemptive "sustained" rulings affected appellant's "substantial rights" or "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Olano, supra*, 507 U.S. at 732, 113 S.Ct. 1770. It is well settled that trial judges have wide latitude to control the conduct of a trial and ensure that counsel's questioning of witnesses, including on cross-examination, comport with evidentiary rules. *See, e.g., Adams v. United States*, 883 A.2d 76, 81–82 (D.C. 2005). Furthermore, we note that appellant does not even attempt to argue that the trial court's rulings were incorrect on the merits. In one instance, for example, the trial court stopped defense counsel from cross-examining a witness about a matter upon which he was not qualified to testify. On another occasion, the trial court stopped defense counsel from repeating a question that the expert had already stated she could not answer. Even if we were to assume that the trial court erred by interjecting a "sustained" before the government had made an objection, we cannot say that these five or six instances

affected appellant's "substantial rights" or "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." [11] *Olano, supra*, 507 U.S. at 732, 113 S.Ct. 1770.

### III.

In conclusion, we affirm, albeit for different reasons, the trial court's denial of appellant's motion to suppress his statements to the police. Without expressing any disbelief that appellant's tone was in fact sarcastic, we conclude that his words (*e.g.* "I'm done talking to you. Go get my lawyer.") were sufficiently clear that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis, supra*, 512 U.S. at 460, 114 S.Ct. 2350. Nevertheless, the trial court did not err in denying appellant's motion to suppress because it was appellant who reinitiated the conversation with police; and, in doing so, he thereby waived his right to have counsel present before any further interrogation. *See Edwards, supra*, 451 U.S. at 484, 101 S.Ct. 1880. We also reject appellant's argument that the trial court assumed a prosecutorial role and thus deprived him of due process. We remand so that the trial court may merge appellant's robbery and second-degree murder charges into his conviction for felony murder and adjust his sentence accordingly. In all other re-

---

**10.** To the extent that the judge's questions seemed to indicate his belief that appellant was guilty (and we agree with appellant that the questions could have been interpreted as such), we caution that such questioning is certainly inappropriate. Because we are in the realm of plain error, however, appellant cannot prevail here for the reasons explained more fully above.

**11.** Appellant also requested leave to file a supplemental *pro se* brief, which the court granted. Having considered the arguments he raised therein, we conclude that none of them have merit. Specifically, appellant was

properly convicted of second-degree murder even though it was not charged in the indictment because second-degree murder is a lesser-included offense of first-degree murder, *see O'Brien v. United States*, 962 A.2d 282, 301 (D.C.2008); appellant's acquittal on the weapons charges did not preclude him being convicted for second-degree murder, *see Fisher v. United States*, 749 A.2d 710, 714 (D.C. 2000); and aiding and abetting does not need to be charged in an indictment for that theory of liability to be submitted to the jury, *see Price v. United States*, 813 A.2d 169, 176 (D.C. 2002).

spects, we affirm the judgment of the trial court.

*So ordered.*